No. 111,024

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Interest of:

M.H.,
DOB XX/XX/2011.

SYLLABUS BY THE COURT

1.

Parties seeking to terminate parental rights to a child potentially subject to the Indian Child Welfare Act must file both the actual notice sent to the tribe, any return receipts received, and any other proof of service so that the court can determine whether the Act's notice requirements were met.

2.

On the facts of this case, the district court's termination of parental rights was proper.

Appeal from Shawnee District Court; JEAN M. SCHMIDT, judge. Opinion filed November 7, 2014. Affirmed.

*John Paul D. Washburn*, of Topeka, for appellant natural father.

*Marie Campbell*, assistant district attorney, and *Chadwick J. Taylor*, district attorney, for appellee.

Before STANDRIDGE, P.J., LEBEN and POWELL, JJ.

LEBEN, J.: Father, E.H., appeals from the district court's order terminating his parental rights to M.H. He argues that the district court erred in two ways: (1) by failing to notify M.H.'s potential Indian tribe in compliance with the procedures outlined in the Indian Child Welfare Act (the Act) and its accompanying guidelines; and (2) by holding that clear and convincing evidence supported finding him unfit to parent M.H.

Father is correct that the Act requires that a party seeking to terminate the parental rights of a child that may be Native American must follow specific procedures for notifying the child's potential tribe about a termination-of-parental-rights hearing. See 25 U.S.C. § 1912(a) (2012). Though the best way for a court to ensure compliance with the Act is for the State to file the notices it has sent and the return receipts it has received with the district court before a termination hearing, the State's failure to do so here doesn't require reversal. The State filed the required notice and receipts after the hearing in this case, and those filings prove that the district court complied with the Act.

Further, while a finding that a parent is unfit must be supported by especially strong (clear and convincing) evidence, the evidence here showed that Father has been incarcerated for the majority of M.H.'s life, hasn't maintained contact with her or the agency, and didn't complete the case-plan tasks assigned to him. Despite some indications that Father has worked toward reintegration with M.H., we find that the district court's decision to terminate his rights was based on clear and convincing evidence. We therefore affirm the district court's judgment.

FACTUAL AND PROCEDURAL BACKGROUND

M.H. was born in June 2011 with a cleft lip and palate. Nurses became concerned for her safety when they saw a physical altercation between her parents, A.G. (the Mother) and E.H. Father apparently grabbed Mother's arm while she was holding M.H., and the nurses notified the State. As a result, the State—through the Kansas Department

2

of Social and Rehabilitation Services, now the Kansas Department for Children and Families—took M.H. into its custody within a week of her birth and placed her with the foster family that she still lives with.

The social-service agency assigned to help the family, formerly TFI, now KVC, immediately scheduled case-plan meetings with the parents. Father didn't attend the first two meetings—on June 24, 2011, and July 18, 2011—even though he had personally spoken with the family's case manager, Jeni Moss, and knew when and where the meeting was taking place. At the second meeting, Father was assigned three case-plan tasks: (1) to have no contact with M.H. per court order; (2) to have no contact with Mother per court order; and (3) to present himself to the agency for more tasks. Father and Mother were still living together, however, despite the no-contact order.

Early in M.H.'s life, the agency determined that Mother likely would not be a good placement for M.H. because she had auditory and visual hallucinations and was often homeless—even when the agency or her family provided her resources.

Father eventually got in contact with the agency and arranged to have supervised weekly visitation with M.H. Father attended two visits but had not seen M.H. since September 2011 at the time of the court's November 2013 hearing. Though Father cancelled one visit because he was sick and knew that M.H. had a surgery, he missed the others because he failed to complete drug tests, because he was committed to inpatient drug treatment, and because he was incarcerated.

After M.H. was removed from Father's care, he began abusing marijuana and cocaine. He was incarcerated in October 2011 for violating his parole by using drugs and for committing a new crime: burglary to a motor vehicle. Father has remained incarcerated since October 2011. In fact, Father has been incarcerated for 26 of his 47 years—many times for violating his parole.

While incarcerated, Father has had numerous disciplinary violations—including one for fighting—which delayed his parole eligibility by 8 months. After Father's release from prison on his current sentence, Father will still have to serve at least part of a 16-month sentence for the auto-burglary conviction, though he testified the sentence may be shorter if he gets credit for good time or if it is recalculated.

The agency continued to involve Father in M.H.'s case even after he was incarcerated. For example, Moss visited Father every month in prison until he was transferred to another facility, at which point she wrote him monthly letters. Though Father testified that he occasionally wrote her back and that he also wrote to another caseworker, he admitted he didn't write often. Moss, however, testified that she never received any correspondence from Father.

Father requested that his ex-wife be given visitation with M.H., and the agency arranged this. His ex-wife, however, didn't visit with M.H. often because of problems in her personal life, and as of the time of the court hearing didn't have a relationship with M.H., according to the family's caseworkers. Father's ex-wife testified that she believed M.H. would be better off remaining in her foster parents' care and said that even if she did gain custody of M.H., Father wouldn't be allowed to live with them upon his release because she operated a daycare and would not be able to do so if a felon lived with her.

Of the numerous case-plan meetings regarding M.H. that occurred between June 2011 and August 2013, Father only attended two—both by phone. On one occasion, his ex-wife appeared on his behalf because Father was in solitary confinement. At the last case-plan meeting before trial, Father was asked to maintain regular contact with the agency and to inform it about his release date and his ability to parent M.H. But after the final meeting, he didn't contact the agency either by phone or letter, nor did he send the agency any information about his expected release date or his ability to parent M.H.

4

The State then moved to terminate both Mother and Father's rights to M.H. At a pretrial hearing, Father told the district court that he'd recently learned that he was Ramapough Lenape Indian. As a result, the district court ordered that the State comply with the notice provisions in the Indian Child Welfare Act—which require that

> "the party seeking the . . . termination of the parental rights to [] an Indian child shall notify . . . the Indian child's tribe, by registered mail with return receipt requested, of the proceedings and of their right of intervention. . . . No . . . termination of parental rights proceedings shall be held until at least ten days after the receipt of notice by . . . the tribe . . . ." 25 U.S.C. § 1912(a).

On June 6, 2013, the court made a docket entry for "Indian Child Welfare Act Notice" but didn't indicate if the notice was sent, to whom it was sent, or if it was filed with the court. The court then postponed the termination-of-parental-rights hearing on two separate occasions for compliance with "notice" requirements. Even so, the court's written journal entries didn't specify the notice requirements at issue. On August 29, 2013, the district court held that the Act "[had] been complied with."

In November 2013, a hearing was held to terminate Mother's and Father's parental rights. At that time, M.H. was 2 1/2 years old, called her foster parents Mom and Dad, and still had numerous surgeries and appointments to undergo before her cleft lip and palate would be completely corrected. Father had only seen her twice since she had been removed from her parents' care, and he had never sent her money, cards, or gifts.

The district court terminated both parents' rights to M.H. In the written order of termination, the court stated that "[t]he Indian Child Welfare Act was not applicable to this case as appropriate notice was sent to the Ramapough Lenape Nation tribe with no response." Mother accepted the court's decision, but Father appealed the termination of

his rights, arguing that the Act's notice requirements had been violated and that the court lacked evidence to support its conclusion that he was unfit to parent M.H.

ANALYSIS

I. *Father's Tribe Received Notice of the Proceedings. Therefore, the State's Initial Failure to File Proof that It Complied with the Act Isn't Reversible Error.*

Father argues that the State didn't comply with the provisions for notifying M.H.'s tribe of the termination-of-parental-rights hearing and that the district court erred by finding that it did. The Indian Child Welfare Act, passed in 1978, 25 U.S.C. § 1901 (2012) *et seq.*, applies to involuntary proceedings to terminate the parental rights of parents of Indian children. 25 U.S.C. §§ 1903(1)(ii), 1911(a) (2012). Whether a child is considered Indian under the Act is ultimately a determination for the child's potential tribe, not the district court. *In re M.B.*, 39 Kan. App. 2d 31, Syl. ¶ 5, 176 P.3d 977 (2008). See the Bureau of Indian Affairs' Guidelines for State Courts; Indian Child Custody Proceedings, Guidelines § B.1—Commentary, 44 Fed. Reg. 67,584, 67,586 (1979); see also 25 U.S.C. § 1903(4) (defining "Indian child").

As a result, if the district court knows or has reason to believe that the child whose parent's rights are sought to be terminated might be Indian, then it must order the party seeking to terminate the parent's rights to provide notice to the child's tribe of the proceedings and to inform the tribe of its right to intervene. Such notice *must* be given by certified mail, return receipt requested, or the parent of the Indian child may seek to have the proceedings invalidated. 25 U.S.C. §§ 1912(a), 1914 (2012); see 25 C.F.R. § 23.11(a) (2014); accord *In re H.D.*, 11 Kan. App. 2d 531, Syl. ¶¶ 2-6, 729 P.2d 1234 (1986). A hearing to terminate a potential Indian child's parent's rights may not be held until at least 10 days after the tribe has received notice. 25 U.S.C. § 1912(a). These rigid procedures exist because the Act intended Indian child-custody proceedings to ""meet stringent requirements"" to justify separating an Indian child from Indian culture. *In re H.A.M.*, 25

Kan. App. 2d 289, 294, 961 P.2d 716 (1998); Guidelines § A.1—Policy, 44 Fed. Reg. at 67,585-86; see 25 U.S.C. § 1902 (2012).

Father argues that the State didn't comply with the Act's procedural requirements because it didn't file a copy of the notice sent to his tribe or a return receipt that proved his tribe received proper notice. Conversely, the State argues that the statute's plain language doesn't require those documents to be filed. It points out that the statute stops short of requiring the notice and return receipts to be filed and merely requires the tribe to be given notice "by certified mail, return receipt requested." 25 U.S.C. § 1912(a).

But we can only determine compliance if proper filings are made in the court record. Accordingly, if a party challenges the notice provided, the State must—at some point—produce the records showing compliance with the statutory notice provisions. Specifically, the hearing terminating an Indian child's parent's rights cannot be held until 10 days after the tribe's *receipt* of notice of the proceedings and notice of the right to intervene. 25 U.S.C. § 1912(a). We must be able to determine when the 10-day clock began to run. See *In re Morris*, 491 Mich. 81, 113, 815 N.W.2d 62 (2012) (noting that while the Act is silent on the recordkeeping requirements of the notice statute, it is essential that return receipts be filed with the court).

The Indian child's parent normally has the burden to provide a sufficient record on appeal to show that the claimed error has occurred. In the case of notice to the tribe, however, the State would have the documentation of what notice was given in its files. Unless those documents are filed with the court, the parent would be unable to present the issue on appeal even if the State had not provided proper notice. That would be untenable and unjust.

Based on these common-sense principles, the Bureau of Indian Affairs recommends in its guidelines that every state require that the actual notice sent to the

7

tribe, the return receipts, and any other proof of service be filed with the district court. Guidelines § B.5(d)—Notice Requirements, 44 Fed. Reg. at 67,588. These guidelines are not intended to have "binding legislative effect," but our courts have frequently looked to them for guidance in interpreting and applying the Act's provisions. Guidelines—Introduction, 44 Fed. Reg. at 67,584; see *In re M.B.*, 39 Kan. App. 2d at 37; *In re S.M.H.*, 33 Kan. App. 2d 424, 433, 103 P.3d 976, *rev. denied* 279 Kan. 1006 (2005). The Bureau's guideline comments note that filing a copy of the notice and proof of its service is necessary to preserve a complete record of the efforts to comply with the Act. Guidelines § B.5—Commentary, 44 Fed. Reg. at 67,589.

We therefore hold that parties seeking to terminate parental rights to a child potentially subject to the Indian Child Welfare Act must file both the actual notice sent to the tribe, any return receipts received, and any other proof of service so that the court can determine whether the Act's notice requirements were met. This holding is consistent with the ruling of courts in several other states. *In re Louis S.*, 117 Cal. App. 4th 622, 629, 12 Cal. Rptr. 3d 110 (2004); *People ex rel. N.D.C.*, 210 P.3d 494, 496-97 (Colo. App. 2009); *Morris*, 491 Mich. at 114; *Matter of K.B.*, 370 Mont. 254, 261, 301 P.3d 836 (2013); *Dependency of E.S.*, 92 Wash. App. 762, 773, 964 P.2d 404 (1994) ("strongly urging" training in the filing of notices and return receipts).

Here, the State initially failed to comply with the Act's notice-filing requirements because it didn't make the notice and return receipts a part of the record. Even at the time of briefing on appeal, the documents were not in our record. Had the record remained that way, we would have been required either to reverse the district court's judgment for the State's failure to comply with the Act's notice requirements (having no proof that it did) or to send the case back for further proceeding on the notice issue. After Father's appellate brief raised the notice issue, the State asked for permission to add the notice documents to the record, and we granted that motion.

8

Our review of those documents shows that the State did comply with the Act. The State sent notice to the Ramapough Lenape Nation, which received it on June 12, 2013. The hearing to terminate Father's rights did not begin until November 5, 2013—nearly 4 months later—clearly after the 10-day period the Act required.

Father raises one additional argument about compliance with the Act's notice requirements. Father argues that because the tribe never received specific notice of the actual trial date—which didn't occur until months after the notice was sent—the notice was insufficient. But the statute doesn't require that the State notify the potential tribe of every possible hearing date—only that it notify the tribe of pending "proceedings." See 25 U.S.C. § 1912(a). The term "proceedings" is not synonymous with "hearing." While a hearing refers to a specific part of a proceeding—here, the trial on the State's motion to terminate Father's rights—proceedings refer to the entire progression of a lawsuit, which may encompass multiple hearings. Compare Black's Law Dictionary 836 (10th ed. 2014) (defining "hearing" as "[*a*] judicial session, usually open to the public, held for the purpose of deciding issues of fact or law" [emphasis added]) with Black's Law Dictionary 1398 (10th ed. 2014) (defining "proceeding" as "[t]he regular and orderly progression of a lawsuit, including *all acts* and events between the time of commencement and the entry of judgment" [emphasis added]). Father's tribe was notified that proceedings to terminate Father's parental rights had begun; no more specific notice was required.

II. *Clear and Convincing Evidence Supported the District Court's Termination of Father's Parental Rights.*

Father's second argument is that the district court lacked sufficient evidence to terminate his parental rights. The district court may only terminate a parent's rights when the party seeking to terminate the rights has shown the parent is unfit and will likely remain unfit for the foreseeable future and that it is in the best interests of the child to terminate the parent's rights. K.S.A. 2013 Supp. 38-2269(a), (g)(1). Further, a parent's

rights may be terminated only when the evidence supporting it is especially strong: under the statute, the evidence must be "clear and convincing." K.S.A. 2013 Supp. 38-2269(a). To be clear and convincing evidence, the facts must be highly probable. *In re B.D.-Y.*, 286 Kan. 686, 705, 187 P.3d 594 (2008).

We review a district court's decision to terminate a parent's rights by asking whether a rational factfinder could have found it highly probable that the parent's rights should be terminated. *In re K.W.*, 45 Kan. App. 2d 353, Syl. ¶ 1, 246 P.3d 1021 (2011). Because the district court—which is charged with finding the facts—terminated Father's rights, we review the evidence in the light most favorable to that determination. See 45 Kan. App. 2d 353, Syl. ¶ 1. Further, in reviewing the district court's decision, we may not reweigh the evidence, judge the credibility of witnesses, or redetermine factual questions. *In re B.D.-Y.*, 286 Kan. at 705.

1.  *Clear and Convincing Evidence Established Father's Unfitness and Showed that His Unfitness Was Unlikely to Change in the Foreseeable Future.*

Father argues that the district court lacked evidence to hold that he was presently unfit to parent M.H and that his unfitness was unlikely to change in the foreseeable future. The district court may base its finding of unfitness on one of several bases outlined by the legislature. See K.S.A. 2013 Supp. 38-2269(a)-(c). If supported by clear and convincing evidence, a single statutory basis for unfitness can support terminating a parent's rights, though courts should consider all applicable factors. K.S.A. 2013 Supp. 38-2269(f). See *In re B.A.D.*, No. 90,973, 2004 WL 556928, at *1 (Kan. App. 2004) (unpublished decision).

In addition to finding that clear and convincing evidence supported one or more statutory bases for terminating Father's rights, the district court also had to find that Father's unfitness to parent was unlikely to change in the foreseeable future. K.S.A. 2013

10

Supp. 38-2269(a). The foreseeable future is examined from the perspective of a child because children and adults have different perceptions of time and children have a right to permanency within a time frame reasonable to them. *In re M.B.*, 39 Kan. App. 2d 31, Syl. ¶ 9; *In re A.A.*, 38 Kan. App. 2d 1100, 1105, 176 P.3d 237, *rev. denied* 286 Kan. 1177 (2008).

The district court found that five statutory bases supported terminating Father's parental rights and were not likely to change in the foreseeable future: (1) his conviction of a felony and his imprisonment; (2) the failure of reasonable efforts by social-service agencies to rehabilitate his family; (3) his lack of effort to adjust his circumstances, conduct, or conditions to meet M.H.'s needs; (4) his failure to provide M.H. care in his home when he had the ability to do so; and (5) his failure to carry out a court-approved plan for reintegrating M.H. into his home. See K.S.A. 2013 Supp. 38-2269(b)(5), (7)-(8), (c)(1) and (3).

Under the first reason that the court found Father unfit—conviction of a felony and imprisonment—Father argues that even though he did commit a felony and was imprisoned, the court erred by concluding that this made him unfit because: (1) his primary felony was committed over 20 years ago; (2) the felony didn't relate to his parenting skills; and (3) the court didn't consider his incarceration a mitigating factor in his ability to comply with the other requirements for reintegration. See K.S.A. 2013 Supp. 38-2269(b)(5). But Father fails to note the evidence that supported the district court's decision, which is clear and convincing.

First, though Father is correct that his initial felony was committed over 20 years ago—in 1987—he has been paroled on this felony numerous times but then sent back to prison several times for failure to abide by his parole's conditions. This includes the violations that put him back into prison *after* M.H. was born, which included drug abuse

11

and the commission of a new crime (auto burglary). Father isn't a one-time offender; he has spent the majority of his adult life—more than 26 years—in prison.

Second, though a felony conviction that related to parenting ability might increase the weight the court gives this factor, the court is not required to give Father special consideration just because the felony he committed was unrelated to his parenting skills. In fact, under Kansas law, simply committing a felony and being imprisoned can constitute the sole basis for a finding of unfitness, regardless of the circumstances of the crime. K.S.A. 2013 Supp. 38-2269(b)(5), (f); see *In re M.D.S.*, 16 Kan. App. 2d 505, Syl. ¶ 4, 825 P.2d 1155 (1992).The termination-of-parental-rights statute refers only to felonies generally and doesn't require the crime to be related to parenting to terminate a parent's rights under this basis. K.S.A. 2013 Supp. 38-2269(b)(5), (f).

Third, even though Father is correct that incarceration *may* be considered a mitigating factor, it's up to the district court how to consider a person's incarceration within the facts of the case. *In re M.D.S.*, 16 Kan. App. 2d at 509-11. In some cases, incarceration might be cause to excuse a parent's failure to complete certain tasks toward reuniting with a child. In other cases, incarceration may be considered a significant negative factor, such as where it has impeded the development of a relationship between the parent and the child, where the parent has been incarcerated for the majority of the child's life and the child spent the time in the State's custody, and where the incarceration would cause further delay in the proceedings that isn't in the child's best interests. 16 Kan. App. 2d at 509-11.

Here, the district court properly considered Father's incarceration a negative factor. Father's incarceration had significantly impacted his relationship with M.H.; Father had been incarcerated for the overwhelming majority of M.H.'s life; and waiting for Father's incarceration to end would have delayed the resolution of M.H.'s case, with no certainty that Father would ever be available to parent her. Even after Father completed the

12

sentence he was serving at the time of the court's hearing, he still had a 16-month sentence in the auto-burglary case.

A rational factfinder could therefore find it highly probable that Father's rights should be terminated because he was unfit to parent M.H. due to his incarceration. The court also could find it highly probable that this condition was unlikely to change in the foreseeable future as viewed by his daughter, given the remaining sentence in the auto-burglary case and Father's historic pattern of violating parole and returning to incarceration.

The second basis the district court relied on to find Father unfit was that the reasonable efforts of the social-service agency failed to rehabilitate the family. Father contends that the agency did not make reasonable efforts. See K.S.A. 2013 Supp. 38-2269(b)(7). He notes that the agency didn't help him apply for Social Security income, did not tell him about M.H.'s involvement in speech therapy, did not send him pictures, did not locate programs for him to complete while incarcerated, and did not facilitate visitation with M.H. at the prison.

But the agency took substantial steps to rehabilitate the family. For instance, the family's case-manager, Moss, visited Father monthly at the prison and wrote to him after he was transferred to a different facility. Moss testified that Father had never responded to the correspondence she had mailed him. Likewise, the agency arranged for M.H. to have visits with Father's ex-wife, who he indicated he preferred as a placement for M.H. But his ex-wife didn't regularly attend or schedule visitations and, as of the time of trial, had not formed a relationship with M.H. Also, the agency regularly held case-plan meetings that Father could attend by phone. Though the agency could perhaps have done more to help Father achieve his case-plan goals, we cannot find that Father's failure to take the initiative to complete them himself or to ask for help in completing them was the agency's fault. A rational factfinder could have found it highly probable that the agency's

reasonable efforts failed to result in rehabilitation and that further efforts would be unlikely to do so in the foreseeable future.

The third basis on which the district court found that Father was unfit—Father's lack of effort to adjust his circumstances, conduct, or conditions to meet the needs of M.H.—was also established by clear and convincing evidence. See K.S.A. 2013 Supp. 38-2269(b)(8). Father argues that he did change his circumstances—by completing inpatient drug treatment, by cooperating with the agency, by having clean drug tests, and by making arrangements for his ex-wife to assume custody of M.H.

But more evidence shows that Father didn't change his circumstances to meet M.H.'s needs. For example, he committed another crime and violated his parole by using drugs after M.H. was born. While in prison, Father incurred numerous disciplinary violations, some of them serious. Had Father not violated prison rules on so many occasions, he could have been released from prison earlier, at which point reintegration with M.H. would have been more likely. Though we appreciate the progress Father did make toward changing his life, a reasonable factfinder could have found it highly probable that Father did not change his circumstances to better meet M.H.'s needs and would be unlikely to do so in the foreseeable future viewed from M.H.'s perspective.

The other two grounds on which the court terminated Father's rights apply only in situations where the child has been living in an out-of-home placement. K.S.A. 2013 Supp. 38-2269(c). These two grounds allow a court to find a parent unfit if the parent failed to care for the child in his home when it was possible to do so and if the parent failed to comply with a reasonable reintegration plan. See K.S.A. 2013 Supp. 38-2269(c)(1), (3). Father argues that neither of these grounds were supported by clear and convincing evidence because he argues that he did care for M.H. in his home when he could and that he had no court-approved reintegration plan to comply with.

14

Father is incorrect that he cared for M.H. in his home when he was able. In fact, testimony showed that M.H. spent as little as a single day or only as much as a week in Father's care before she was taken into the State's custody. Further, Father did not appear at the first two case-plan meetings to arrange a plan for quicker reintegration. After M.H. was removed from his care, Father abused drugs, violated a court order, and committed an auto burglary—actions that prevented him from regaining custody of M.H. even when he wasn't incarcerated.

Similarly, while the agency may have failed to submit a case plan to the court for approval, Father knew what his reintegration tasks entailed but did not complete them. Father participated in a few case-plan meetings and made no objection to his case-plan tasks. Just before trial, Father's main case-plan task was to remain in contact with the agency regarding M.H., but he failed to do even that. Thus, a rational factfinder could have found it highly probable that Father had failed to care for M.H. in his home when it was possible, that Father had failed to comply with a plan for reintegration, and that these conditions were unlikely to change in M.H.'s foreseeable future.

2. *The District Court Did Not Abuse Its Discretion by Finding that Terminating Father's Rights Was in M.H.'s Best Interests.*

Father contends that even if the court had a statutory basis for declaring him unfit and was justified in holding that his unfitness was unlikely to change in the foreseeable future, it abused its discretion by finding that terminating his parental rights was in M.H.'s best interests.

Even after finding unfitness that is unlikely to change in the foreseeable future, a court must also determine that terminating the parent's rights is in the child's best interests before it can terminate those rights. K.S.A. 2013 Supp. 38-2269(g)(1). In making the

best-interests determination, the court gives primary consideration to the child's physical, mental, and emotional needs. K.S.A. 2013 Supp. 38-2269(g)(1).

The determination of what is in a child's best interests is inherently a judgment call, so we review the decision for abuse of discretion. *In re R.S.*, 50 Kan. App. 2d ___, Syl. ¶ 2, ___ P.3d ___ (No. 111,027, October 24, 2014). A district court abuses its discretion only when it bases its decision on an error of fact or law or when its decision is so unreasonable that no one would agree with it. *Critchfield Physical Therapy v. The Taranto Group, Inc.*, 293 Kan. 285, 292, 263 P.3d 767 (2011); *State v. Ward*, 292 Kan. 541, 550, 256 P.3d 801 (2011), *cert. denied* 132 S. Ct. 1594 (2012).

Father specifically argues here that the district court abused its discretion by terminating his rights to M.H. when he had proposed a viable alternative—that his ex-wife could assume custody of M.H. He notes that his ex-wife is a licensed daycare provider and could facilitate a relationship between him and M.H.

The district court considered and rejected Father's ex-wife as a potential placement for M.H. It noted that Father's ex-wife had not pursued opportunities to have a relationship with M.H. In addition to the evidence mentioned by the district court, Father's ex-wife agreed at trial that M.H. would be better off if she remained with her foster family. Father's ex-wife also said that even if she did obtain custody of M.H., Father would not be able to live with them because she cannot run a daycare if a felon resides at her home. A reasonable person could agree with the district court that Father's ex-wife was not a suitable placement for M.H.

Father also argues that the district court abused its discretion by terminating his rights to M.H. because the foster parents agreed to allow him to remain involved in M.H.'s life—which he argues is in her best interests. While maintaining some type of relationship may be in M.H.'s best interests, terminating Father's rights allows M.H. to be

16

adopted by her foster family and to have a permanent home. The district court held that M.H.'s best interests would be served by immediate placement in a safe and stable home, which the foster parents have proven that they can provide. A reasonable person could agree with the district court's decision. We find no abuse of discretion in the district court's conclusion that M.H.'s best interests would be met by terminating Father's rights and allowing her foster parents, who have raised her since she was a week old, to adopt her.

We understand that these cases are difficult. "A parent may be labeled 'unfit' under the law even though he or she loves the child and wants to do the right thing, which may be the case here." *In re A.A.*, 38 Kan. App. 2d at 1105. But our obligation is to provide final resolution within a reasonable amount of time viewed from M.H.'s perspective. See 38 Kan. App. 2d at 1105. While Father made some progress toward becoming a better parent—by undergoing drug and alcohol counseling, for example—his progress was insufficient under the law and his undetermined prison-release date is too far in the future to ask M.H. to wait.

We affirm the district court's judgment.

17