NOT DESIGNATED FOR PUBLICATION

No. 113,726

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Interest of K.P.
DOB: XX/XX/2011
A Male
A Child Under 18 Years of Age.

MEMORANDUM OPINION

Appeal from Jefferson District Court; GARY L. NAFZIGER, judge. Opinion filed December 18, 2015. Affirmed.

*Randy M. Barker*, of Topeka, for appellant.

*Bethany J. Lee*, assistant county attorney, for appellee.

Before HILL, P.J., PIERRON and POWELL, JJ.

*Per Curiam*: L.P., the natural father of K.P. who was born in 2011, appeals from the termination of his parental rights. Father claims the district court erred by finding that the condition or conduct that rendered him unable to care properly for K.P. was unlikely to change in the foreseeable future. He also asserts the district court failed to consider whether termination of his parental rights was in K.P.'s best interests. The record on appeal reveals clear and convincing evidence to support the district court's finding that Father's unfitness was not likely to change in the foreseeable future. The record also refutes Father's assertion that the court did not consider K.P.'s best interests. Therefore, we affirm.

1

Because Father challenges the sufficiency of the evidence, we will set out the facts in detail. But because this appeal concerns the termination of Father's parental rights and not the termination of the parental rights of K.P.'s natural mother, we will address her role in these proceedings only as necessary.

On September 23, 2013, the Jefferson County Sheriff's Department responded to reports of a domestic disturbance. As they approached the home in question, two children came outside—2-year-old K.P. and an older child, N.P. K.P was naked and N.P. told deputies that he was scared and the adult who lived there—K.P.'s paternal grandmother—had woken up earlier and begun destroying the inside of their home. After speaking to the grandmother, law enforcement arrested her for child endangerment and disorderly conduct. When she was searched after arriving at jail, law enforcement discovered drug paraphernalia.

The following day, the State filed a petition to have K.P. adjudicated a child in need of care (CINC) pursuant to K.S.A. 2014 Supp. 38-2202(d)(1), (2), and (3), alleging he was without adequate parental care, control or subsistence and the condition was not due solely to the lack of financial means of his parents or other custodian; was without the care or control necessary for his physical, mental or emotional health; and had been physically, mentally or emotionally abused or neglected or sexually abused. The court appointed a guardian ad litem for K.P.

On September 25, 2013, the district court held a temporary custody hearing. Father did not appear in person because he was incarcerated, but the court appointed counsel to represent him. Due to allegations of physical violence and drug use by K.P.'s primary caregiver, the district court placed K.P. in the temporary custody of the Kansas Department of Children and Families (DCF). At a hearing on October 16, 2013, Father stipulated through counsel to the allegations in the CINC petition, but Mother requested an evidentiary hearing, which was continued multiple times. Father was released from

2

prison on February 23, 2014, and on April 16, 2014, at a hearing at which Father appeared in person, the court adjudicated K.P. a CINC.

Since his release from prison, Father had been working with Molly Juhl, of Kaw Valley Center (KVC). Juhl first spoke with Father on the phone on March 11, 2014, and they met on April 9 to go over his case plan tasks. The tasks included obtaining adequate housing and a legal source of income, scheduling and completing an assessment through Heartland Regional Alcohol & Drug Assessment Center (HRADAC) within 120 days, following the recommendations from that assessment, and submitting to random urinalysis drug testing (UAs).

On April 11, 2014, Juhl supervised a visit between K.P and Father, which she later testified went very well. K.P. was visibly excited to see Father and they played well together. They had other supervised visits on April 18 and April 24. At the April 24 visit, Juhl gave Father a pink slip to take a UA and a hair follicle drug test that day. Juhl later learned that Father did not take the tests. Juhl left messages for Father on May 1 and May 13, informing him that there would be no more supervised visits until he completed the tests.

The district court held a disposition hearing on May 14, 2014, but Father did not appear in person and Grandmother informed the court that he might be in jail. Holding that reasonable efforts had been made to prevent unnecessary removal of K.P., the court set the permanency plan goals as adoption or permanent custodianship, with a concurrent goal of reintegration. However, the court further held that reintegration was not a viable goal due to Mother's lack of contact with her counsel and the court and Father's failure to attend case planning meetings and take requested drug tests.

Juhl and Father met on June 16, 2014. Juhl reinforced the importance of consistency and contact with KVC and gave him an additional slip to obtain a UA and

3

hair follicle testing. Father took the test, which was positive for amphetamine, methamphetamine, and THC. In late June 2014, Juhl left KVC and transferred the case to Lacey Villamar. Juhl and Villamar both attended a case plan meeting with Father on June 26, 2014. They went over the remaining case plan tasks such as obtaining adequate housing and a legal source of income, scheduling an assessment with Heartland within 30 days and completing it within 120 days, following the resulting recommendations, submitting to random UAs, keeping in contact with KVC, signing releases for KVC to speak with his probation officer, following the terms of his probation, and not using illegal drugs. Villamar gave Father the contact information so he could schedule the Heartland assessment.

At a status hearing also in late June 2014, Father again appeared through counsel only. The district court noted that Father had recently tested positive for narcotics. Because of Mother and Father's continuing absence, drug use, and inadequate progress on case plan tasks, the court held that reintegration was no longer a viable goal; accordingly, the court modified the case-plan goal to adoption.

Villamar continued working with Father. On July 8, 2014, Father passed a UA. He and Villamar were scheduled to meet again on July 10, but Father did not show up; Villamar later learned Father had been in jail. Father called Villamar on July 21 and said he was out of jail, so they scheduled a meeting for July 23, but Father did not show up because he was in jail again. On July 30, after being released, Father met with Villamar, provided a clean UA, and discussed his progress on his case plan tasks.

Father reported that he had a job interview the next day and that he was staying in Topeka with his fiancée. Villamar again provided contact information to set up the Heartland assessment and asked Father to sign a release with his probation officer so the officer could speak to KVC. Villamar called Father in for a UA on August 5, but Father did not follow through. They were scheduled to meet on August 11, but Father asked to

4

reschedule due to demands from the job he had obtained. They rescheduled the meeting to August 22, but on August 21, Father's fiancée informed Villamar that Father was back in jail.

Villamar left messages for the fiancée on September 8, 9, and 16, but she did not call back. On September 23, Villamar called Jefferson County Jail to schedule a visit with Father and learned he had been released 2 weeks earlier. Villamar called Father again on September 30, but the phone went straight to voicemail. When Father called her back, he explained that he had not called because he had been busy working. They agreed to meet that day.

At that meeting, Father told Villamar that he was working at Southwest Publishing and provided the address where he and his fiancée were living with her father. Father also said he had rescheduled his Heartland assessment and he had missed an earlier scheduled assessment because he was in jail. On October 9, Villamar called Father to come in for a UA but could not reach him. On October 21, Father failed to show up for a scheduled meeting and Villamar could not reach him by phone. Father later said he had forgotten about the appointment. Villamar asked Father to come in for a UA on October 29, but he sent her a text message that day saying he would not be able to make it. When Father also did not show up for their scheduled meeting on November 3, Villamar learned he was in jail again.

Villamar visited Father at the Shawnee County Jail on November 17, 2014. He explained he was there because he had smoked methamphetamines, gone to Walmart, and walked out with the shoes he had tried on. When he was searched, he had a pipe on him. Villamar visited Father again at the jail on December 29. He updated her on the status of the current criminal proceedings and informed her of an outstanding warrant in Jefferson County. At another meeting at the jail in late January 2015, Father told Villamar he had

been referred to Heartland for an assessment. He completed the assessment while in custody.

On February 18, 2015, the State filed a motion to terminate parental rights to K.P. As to Father, the State alleged that termination was proper under (1) K.S.A. 2014 Supp. 38-2269(b)(3) because his use of intoxicants and drugs rendered him unable to meet K.P.'s ongoing physical, mental or emotional needs; (2) K.S.A. 2014 Supp. 38-2269(b)(5) because he had been convicted of a felony and imprisoned; (3) K.S.A. 2014 Supp. 38-2269(b)(7) because reasonable efforts by appropriate public agencies had failed to rehabilitate the family; (4) K.S.A. 38-2269(b)(8) because Father had not made an effort to adjust his circumstances, conduct, or conditions to meet K.P.'s needs; and (5) K.S.A. 2014 Supp. 38-2269(b)(9) because K.P. was in extended out-of-home placement due to his parents' actions and Father had failed to maintain regular visitation, contact, or communication with K.P.'s custodian. As part of the extensive, 42-page petition, the State set forth a detailed timeline of the proceedings, Father's inconsistent interactions with KVC workers; information from court reports from K.P.'s foster parents, who reported that K.P. was doing very well; and other information in support of the petition.

On February 26, 2015, Villamar had her final contact with Father. She met with him at the jail and Father said he anticipated getting out of jail very soon and he would start the treatment recommended by Heartland as soon as he was released. They again went over KVC's recommendations.

The termination hearing occurred on March 30, 2015, and Father appeared in person and with counsel. Father was transported to the hearing from Shawnee County Jail. After his arrival, the State presented testimony from Juhl and Villamar. In addition to testifying about the events related above, Juhl summarized that during the time she worked with Father, he initially took random UAs but stopped after the first month. Out of six UAs, he tested positive twice and failed to take the first hair follicle test. She also

6

testified that she did not believe he had a source of income during that time, he had not obtained adequate housing, and he had not obtained the required Heartland assessment.

For her part, Villamar testified about her contact with Father. She stated that during the time he was not in jail, Father had failed to come to appointments with her four times. He had passed 5 UAs, tested positive once, and once could not produce a sample but admitted it would test positive. On three occasions Villamar told Father to come for a UA and he did not, and he missed additional scheduled appointments at which she could have given him a UA. According to Villamar, the last time K.P. had contact with Father was April 24, 2014. After Villamar testified, the State rested.

Father testified on his own behalf. He admitted that on May, 5, 2013, when K.P. was 2 years old, he had gone to prison for felony fleeing and eluding, but until his incarceration, he had been K.P.'s primary caregiver, spending every day with K.P. When Father was released from prison in February 2014, he became involved in the ongoing CINC proceedings.

Father explained that his intermittent incarceration since February 2014 was mainly because of his failure to pay fines from a prior criminal case. He could not pay the fines because he had no job. He estimated out of the four times he had been jailed between February 2014 and November 2014, for a total of 3 months, two or three were for nonpayment of fines. On October 28, 2014, Father had again been incarcerated, this time on charges of possession of methamphetamine and drug paraphernalia, which had not been resolved by the termination hearing.

Father also testified that when he was not in jail, he was working, sometimes two jobs, and he still wanted custody of K.P. and wanted to change. He wanted to follow the Heartland recommendations and receive treatment upon his release from jail. On cross-examination, however, Father admitted there was an outstanding warrant in Jefferson

7

County as well as the pending Shawnee County proceedings. After closing argument, the district court ruled from the bench and terminated Father's parental rights.

On March 31, 2015, the district court filed its written journal entry terminating parental rights. In this form entry, the court indicated it had found clear and convincing evidence that Father was unfit by reason of conduct or condition which rendered him unlikely to care properly for K.P. and that the conduct or condition was unlikely to change in the foreseeable future due to his use of narcotics, failure to comply with efforts at rehabilitation, past felony convictions, and potential for future felony convictions. The court further held that termination of parental rights was in K.P.'s best interests and his physical, mental, or emotional needs would be best served by terminating parental rights. Accordingly, the court terminated Father's parental rights. Father timely appealed.

*Was There Sufficient Evidence to Support the District Court's Finding that Father's Unfitness as a Parent was Unlikely to Change in the Foreseeable Future?*

Father argues the district court erred by finding the conditions and conduct on which it based its finding of unfitness were unlikely to change in the foreseeable future. Specifically, Father claims the court did not give enough weight to the progress he had made toward the case plan tasks prior to his most recent incarceration. The State asserts that clear and convincing evidence supported the court's finding.

When reviewing a district court's decision to terminate parental rights to a child, we must view the evidence in the light most favorable to the State and determine whether a rational factfinder could have found it highly probable, *i.e.,* by clear and convincing evidence, that the parent was rendered unfit by conduct or a condition unlikely to change in the foreseeable future. See *In re B.D.-Y.*, 286 Kan. 686, 705, 187 P.3d 594 (2008); *In re M.H.*, 50 Kan. App. 2d 1162, 1170, 337 P.3d 711 (2014). In making this

8

determination, we do not reweigh evidence, assess witness credibility, or redetermine factual questions. See *In re B.D.-Y.*, 286 Kan. at 705.

Before terminating parental rights, K.S.A. 2014 Supp. 38-2269(a) requires that a district court "find[] by clear and convincing evidence that the parent is unfit by reason of conduct or condition which renders the parent unable to care properly for a child and the conduct or condition is unlikely to change in the foreseeable future." The idea of "the foreseeable future" is considered from a child's perspective "because children and adults have different perceptions of time and children have a right to permanency within a time frame reasonable to them. [Citations omitted.]" *In re M.H.*, 50 Kan. App. 2d at 1170-71.

K.S.A. 2014 Supp. 38-2269 also contains a nonexclusive list of factors a district court shall consider when making a fitness determination, including the use of narcotic "drugs of such duration or nature as to render the parent unable to care for the ongoing physical, mental or emotional needs of the child"; "conviction of a felony and imprisonment"; "failure of reasonable efforts made by appropriate public or private agencies to rehabilitate the family"; "lack of effort on the part of the parent to adjust the parent's circumstances, conduct or conditions to meet the needs of the child." See K.S.A. 38-2269(b)(3), (5), (7), and (8). In its written journal entry, the district court identified these circumstances as the bases for its finding that Father was unfit: "[U]se of narcotics, failure to comply w/ efforts of rehabilitation by State/Public agencies, conviction of felony [and] potential felony conviction in future."

Father now contends the district court failed to adequately consider whether these conditions were unlikely to change in the foreseeable future. He emphasizes the work he did toward reintegration—passing UAs, obtaining full-time employment, obtaining the Heartland assessment, and finding an apartment. He argues that before his arrest in October 2015 he was "demonstrating a substantial change" and the court should have waited to see if the pending criminal case resulted in a conviction.

9

While Father presented evidence that he made progress toward completing his case plan tasks and changing his life by obtaining employment, securing an apartment, and obtaining the Heartland assessment, there was also plentiful evidence that Father's circumstances were not likely to change in the foreseeable future to the extent that he would be able to meet K.P.'s needs. Father had been incarcerated during much of K.P.'s life. At the time of the termination hearing, Father was in jail on pending drug-related criminal charges and had an outstanding warrant in another county, which supported the findings that Father's incarceration and drug use were unlikely to change in the foreseeable future. In addition, Father had missed multiple appointments with KVC workers and had failed or missed multiple drug tests.

In addition, his incarceration at the time of the termination hearing severely undermined the weight afforded the progress he had made before that arrest. Accordingly, despite the progress made toward changing his conduct and circumstances prior to his incarceration in October 2014, clear and convincing evidence supported the district court's finding that the conduct and circumstances that rendered Father unfit to care for K.P. were unlikely to change in the foreseeable future. We affirm that finding.

*Did the District Court Adequately Consider Whether Termination of Father's Parental Rights was in K.P.'s Best Interests?*

Next, Father alleges the district court did not consider whether terminating his parental rights was in K.P.'s best interests. He asserts the State presented no evidence about how termination would affect K.P.'s mental, physical, or emotional health and the court did not make any best-interests findings on the record. In response, the State points out that the guardian ad litem addressed K.P.'s best interests in her closing argument supporting termination of Father's parental rights. The State also asserts that the questions the district court asked Father's counsel demonstrated that it had considered K.P.'s best

10

interests. Moreover, the State claims the evidence clearly supported finding that termination was in K.P.'s best interests.

K.S.A. 2014 Supp. 38-2269(g)(1) requires a court that finds a parent unfit to also "consider whether termination of parental rights as requested in the petition or motion is in the best interests of the child. In making the determination, the court shall give primary consideration to the physical, mental and emotional health of the child." Resolution of Father's claim requires interpretation of this statute, over which this court has unlimited review. See *Merryfield v. Sullivan*, 301 Kan. 397, 398, 343 P.3d 515 (2015).

The district judge's oral ruling on the termination petition did not mention K.P.'s best interests:

> "Based upon the evidence and testimony presented and the proffers as to the default, this Court finds that the State has established by clear and convincing evidence that both parents of the respondent child are unfit by reason of conduct or condition and that their parental rights should be terminated.
> "The Court finds that it is unlikely that the condition or conduct is likely to change in the future.
> "The Court finds that the basis for the termination turns around the use of narcotics, turns upon failure to comply with reasonable efforts at rehabilitation by the state and public agencies.
> "The Court finds that it turns upon a conviction of a felony and imprisonment and the possibility of another conviction and imprisonment, lengthy jail time, and generally failing to make a good-faith effort with the plans that were established several times by the state agency.
> "The Court finds, therefore, that the parental rights of both parties are terminated."

The journal entry form filed later contained only one mention of the best interests of K.P.—a box was checked next to the prewritten statement: "Considering the physical,

11

mental or emotion[al] health of the child, termination of parental rights is in the best interests of the child named above, and the physical, mental or emotional needs of the child would be best served by termination of parental rights." There is no other indication that the district court considered K.P.'s best interests, as it was statutorily required to do. In addition, neither of the State's witnesses testified about whether they believed termination was in K.P.'s best interests.

Father argues that this lack of express oral findings and direct testimony shows that the district court did not consider whether termination was in K.P.'s best interests and means that we must reverse the judgment of termination of parental rights. But we have previously held that this language on a journal entry form is sufficient to satisfy the statutory requirement. See *In re M.T.S.*, No. 112,776, 2015 WL 2343435, *9 (Kan. App. 2015) (unpublished opinion), *rev. denied* 302 Kan. ___ (2015). Moreover, as the court in *In re K.G.*, No. 112,115, 2015 WL 3514169, *11 (Kan. App. 2015) (unpublished opinion), *rev. denied* 302 Kan. ___ (2015) has stated: "K.S.A. 2014 Supp. 38-2269(g)(1) does not require that the district court make specific findings on the record when deciding whether termination is in a child's best interests, only that it consider the statutory criteria."

In addition, we distinguish the case Father cites in support, *In re K.R.*, 43 Kan. App. 2d 891, 233 P.3d 746 (2010). In that case, the district court noted that it needed to consider the best interests of the children but stated only that their mother's "'past actions reflect[ed] an inability to carry through with her day-to-day obligations for the benefit and best interests of [the children].'"43 Kan. App. 2d at 904. On appeal, we held that the district court had failed to properly consider the best interests of the children involved. 43 Kan. App. 2d at 904. In other words, the mother's inability to complete certain obligations in her children's best interests did not necessarily mean that termination of her parental rights was in the children's best interest. 43 Kan. App. 2d at 904. In addition, the

12

guardian ad litem in *In re K.R.* advocated against termination, a fact to which we afforded great weight. 43 Kan. App. 2d at 904.

Here, on the other hand, the journal entry explicitly reflects that the district court considered the best interests of K.P. Additionally, the guardian ad litem argued at the termination hearing that termination was in K.P.'s best interests because K.P. deserved permanency, security, and stability, especially in his formative years. In light of the journal entry stating that the district court considered K.P.'s physical, mental, and emotional health; that his needs would be best served by termination; and that termination was in his best interests, Father's assertion that the district court did not consider K.P.'s best interests fails.

Affirmed.