NOT DESIGNATED FOR PUBLICATION

No. 123,479

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Interest of G.G.,
A Minor Child.

MEMORANDUM OPINION

Appeal from Saline District Court; PATRICK H. THOMPSON, judge. Opinion filed June 25, 2021.
Affirmed.

*Charles C. Lindberg*, of Allen & Associates Law, LLC, of Minneapolis, for appellant natural
father.

*Nathan L. Dickey*, assistant county attorney, for appellee.

Before ARNOLD-BURGER, C.J., BUSER, J., and MCANANY, S.J.

PER CURIAM:  Father challenges the district court's termination of his parental
rights to G.G. The parental rights of Mother were also terminated, but she has not
appealed. In our review of the record, we find support for the district court's decision to
terminate Father's parental rights and that the termination was in the best interests of the
child.  We affirm.

FACTS

The record discloses that on December 13, 2019, the State petitioned to have G.G.,
who was six months old at the time, declared a child in need of care (CINC) based on
K.S.A. 2019 Supp. 38-2202(d)(1) (the child being without adequate parental care which
is not due to the parents' lack of financial means) and K.S.A. 2019 Supp. 38-2202(d)(2)

1

(the child being without the care or control necessary for the child's physical, mental, or emotional health). Mother was age 23 at the time, and Father was age 19. This action was prompted by Mother being observed smoking cigarettes, marijuana, and methamphetamine in a car with G.G. while the windows were up, and Mother, who was on probation at the time, tested positive for morphine, cocaine, and marijuana the next day. The Department for Children and Families (DCF) had offered services to these parents, but they refused.

Father was unemployed and also on probation. Though he claimed he was compliant with his probation requirements and that all of his urinalysis (UA) tests had been negative, his probation officer said otherwise. Father had been kicked out of a sober living house for refusing to provide a UA on two occasions, he would not provide officers with his current address, and he had recently been involved in a car accident and allegedly told a Highway Patrol trooper that he was high on meth all that day. He also had recently provided a UA sample that was positive for methamphetamine, but the sample was too small to be sent to the lab so he was told to stay until he could provide another sample. Father refused to do so, left, and had not provided another sample since. Father was required to participate in outpatient services but has failed to do so. The prior month, Father had reported auditory hallucinations and exhibited paranoid thinking. According to his mother, he was diagnosed with schizophrenia in 2018. The court issued an ex parte temporary order placing G.G. with DCF.

On December 18, 2019, the court held a temporary custody hearing. By the time of the hearing, Father was incarcerated but he appeared in person with counsel for the hearing. The court granted DCF temporary custody and scheduled a review hearing for January 23, 2020. DCF later placed G.G. with his maternal grandmother (Grandmother). He remained with Grandmother throughout the case.

Case workers from DCF and Saint Francis Ministries (SFM) prepared a case plan that called for reintegration as the permanency goal. The plan, as ultimately approved by the court, called for Father to do the following:

- Maintain appropriate, stable housing
- Maintain stable employment to meet his financial obligations
- Submit to random UAs with negative results
- Obtain a mental health evaluation and follow the recommendations
- Obtain drug/alcohol evaluation and follow recommendations
- Complete parenting education classes geared to G.G.'s age and needs
- Abide by court orders and not have negative contact with law enforcement
- Have consistent contact with SFM, attend all appointments with SFM and any providers, and notify SFM of any change of address withing 48 hours.

In preparing the plan, the case workers met with Father at the Saline County jail where he was confined for probation violations. Father refused to cooperate with SFM and said he did not want to participate in any meetings regarding G.G. He refused to sign any consent forms or intake paperwork for SFM to provide services. He refused to take the intake worker's contact information and returned to his cell.

In January 2020, Father was transferred to the El Dorado Correctional Facility to serve a 34-month sentence.

On February 6, 2020, the court held a hearing for an adjudication on the State's CINC petition. Neither parent appeared in person. Father was in prison, and Mother was in treatment but had outstanding warrants. Both appeared through their respective counsel. The court continued the hearing with respect to the claims against Mother but found that G.G. was a CINC with respect to Father. G.G. was to continue in State

3

custody. The court approved the proposed permanency plan with the goal of reintegration.

Father still had not signed the necessary paperwork for SFM to begin providing services. Courtney Moye was the primary permanency specialist from SFM who worked on the case. Moye sent Father a letter updating him on the case, but Father failed to respond to the letter. That spring, Moye made arrangements for monthly telephone calls to Father to update him on the case. She recommended to Father that he participate in any drug and alcohol programs and parenting classes that were available to him while he was in prison.

In August 2020, SFM permanency specialist Kari DePaz had apparently replaced Moye. The State moved to terminate the parental rights of G.G.'s parents, and the court changed the permanency goal for G.G. from reintegration to adoption.

Through all of this, G.G., who was now 17 months old, remained in the care of Grandmother where he continued to do very well.

*Trial*

The termination proceedings were held on November 2, 2020. By this time G.G. had been in out-of-home placement with Grandmother for approximately 11 months. Neither parent appeared for the hearing, but their counsel did. A transportation order had been entered for transporting Father from the prison to the court for the hearing, but Father declined to come. Father's attorney stated:

> "Your Honor, I've spoken with [Father] on several different occasions. My latest
> conversation with [Father] was on Friday where I confirmed he did not want to attend
> today's hearing.

4

"I asked him, 'If he would like to relinquish his rights?'

"And he said, 'He would not.'

"He just hopes that from the report the Court can see that he did as much as he could while he was incarcerated. But he does understand that he's not going to be released for at least another nine months.

"And he also understands that just by reason of his incarceration he fits well within the statutory definition of unfitness.

"And so, Your Honor, we would proceed—or allow the State to proceed by default today."

Though Father was agreeable to disposing of the matter by way of a default judgment against him, the court declined, stating: "Well, since the Mother does not take the position not be default [*sic*], I think probably you ought to present some evidence, Mr. [assistant district attorney] Dickey."

*Courtney Moye*

Moye from SFM testified that she had been assigned to Father's case from the beginning in December 2019, but she was replaced by another worker (apparently DePaz who briefly took over in about August 2020, as noted earlier) until September 2020 when Moye returned to the case.

Moye testified that when she saw Father in court she gave him her card and asked him to contact her. But Father did not finally decide to talk with the SFM staff until March 2020. The reason for the delay was that "at the very beginning of the case when we went—St. Francis went to complete all of our paperwork with him, [Father] refused to even participate in any services with us." That was in December 2019 when Father was in the Saline County jail.

5

She testified that Father has had no contact or interaction with G.G. since Father was incarcerated, which would have been before G.G. was placed in DCF custody in the CINC proceedings. The prison did not provide any type of Zoom visitation. Moye did not know whether El Dorado allowed in-person visitation for young children. SFM does not recommend young children having visitations in a correctional facility.

Moye testified that Father's reintegration plan required him to perform the tasks outlined earlier in this opinion. According to Moye, Father's earliest possible date for release from prison was August 23, 2021, so he would not be able to start working on some of the tasks in his reintegration case plan until then. Father had not completed a majority of the case plan tasks. Moye opined that it would take a year after Father's release from prison in order to complete his reintegration tasks and be available to be a parent of G.G. She opined that the delay in reintegration would not be in the child's best interests.

Moye testified that Father maintained contact by phone with SFM. Moye only had three visits with Father, all by phone: March 30, April 15, and May 20, all in 2020. She did not consider it reasonable that she only had these three communications with Father over the preceding 11 months. (There was no evidence that Father initiated any calls to Moye though he had Moye's telephone number.)

Father was required to take parenting classes as directed by SFM, which are suitable to G.G.'s needs and age. Moye considered this requirement important because of reports of Father's drug use and domestic violence. Moye testified that Father told her that the prison had a program but that it was limited. Moye had not heard from Father about whether he was able to get into the prison's parenting program.

Moye did not know whether Father obtained a drug and alcohol evaluation, but she was acquainted with the RADACT program that performs drug and alcohol

evaluations for prison inmates. She never received an evaluation of Father from RADACT.

With respect to the requirement for random UAs, Moye testified that Father has so far complied with this requirement in that he submitted to a UA as directed whenever he appeared in court. (Of course, he only personally appeared in court one time—on December 18, 2019, when the court held a temporary custody hearing at the outset of the CINC case.)

With regard to the requirement of a mental health evaluation, Moye did not know what was available for prison inmates.

Moye was not aware of any contacts DePaz made with Father during the limited time DePaz was handling the case. She did not think this represented reasonable efforts on the part of DePaz.

*Grandmother*

G.G. had been placed with Grandmother throughout these proceedings. She participated in the proceedings by video and testified that G.G. was placed with her when the child was six months old. He is currently 17 months old. When G.G. first came to her he had some catching up to do, which she attributes to the trauma he experienced during his first six months of life. But he is being treated by an occupational therapist specialist, and he now is doing wonderfully; he is meeting all his milestones. She reported that G.G. is loved by his extended family and is an integral part of the family.

Fazio participated in a case plan meeting on August 18, 2020. Father participated by phone. During that meeting, Father never said that he did not know what he was expected to do.

7

*The Court*

The district court found that SFM had made reasonable efforts to reintegrate G.G. with his parents. The court also found clear and convincing evidence that both Mother and Father were unfit parents, that their conduct or condition was unlikely to change in the foreseeable future, and that termination of their parental rights was in the best interests of G.G.

With respect to Father, the court found that Father used intoxicating liquors or narcotic or dangerous drugs that rendered him unable to care for G.G.; that Father was convicted and imprisoned for a felony; that Father's earliest possible release date is August 23, 2021; and that there was a lack of effort on Father's part to adjust his circumstances to meet G.G.'s needs. The court also found that SFM made reasonable efforts with regards to Father, noting that he refused services for a time. SFM had placed G.G. with a family member so that family contact could be maintained, and contact was maintained between SFM and Father while Father was incarcerated.

Father appeals, contending that the district court erred in terminating his parental rights.

ANALYSIS

*Standard of Review*

> "When the child has been adjudicated to be a child in need of care, the
> court may terminate parental rights or appoint a permanent custodian when the
> court finds by clear and convincing evidence that the parent is unfit by reason of
> conduct or condition which renders the parent unable to care properly for a child

8

and the conduct or condition is unlikely to change in the foreseeable future."
K.S.A. 2020 Supp. 38-2269(a).

When an appellate court reviews a district court's termination of parental rights, it should "'consider whether, after reviewing of all the evidence in the light favoring the State, it is convinced that a rational factfinder could have found it highly probable, *i.e.*, by clear and convincing evidence, that the parents' right should be terminated.'" *In re K.H.*, 56 Kan. App. 2d 1135, 1139, 444 P.3d 354 (2019).

In reviewing a district court's decision using a clear and convincing evidence standard, an "appellate court does not weigh conflicting evidence, pass on credibility of witnesses, or redetermine questions of fact." *In re B.D.-Y.*, 286 Kan. 686, 705, 187 P.3d 594 (2008).

The district court is also required to determine whether the termination is in the child's best interests. K.S.A. 38-2269(g)(1). We review the district court's decision regarding the best interests of the child for an abuse of discretion. *In re M.H.*, 50 Kan. App. 2d 1162, 1175, 337 P.3d 711 (2014).

*Discussion*

When determining whether to terminate an individual's parental rights, the district court shall consider a list of nonexclusive factors set out in K.S.A. 2020 Supp. 38-2269(b). Any one factor may, but does not necessarily, establish grounds to terminate the person's parental rights. K.S.A. 2020 Supp. 38-2269(f).

We focus on the factor cited in K.S.A. 2020 Supp. 38-2269(b)(8)—Father's lack of effort to adjust his conduct to meet the needs of G.G.—because that was the focus of the termination hearing. We also direct our attention to Father's claim that the district court

9

erred in finding under K.S.A. 2020 Supp. 38-2269(b)(7) that SFM made reasonable efforts to reintegrate the family.

Father's approach to these termination proceedings was tepid at most. He did not attend the termination hearing. Grandmother testified at the hearing by video. Father could have participated and testified either by video or telephone, but he chose not to. Rather, he left it to the court to review the reports it had been provided during the course of the case to establish that he "did as much as he could while he was incarcerated." In fact, he went so far as to invite the court to proceed by entering a default judgment against him. These are not the actions of a father who wishes to be involved in his child's life.

Now, on appeal, Father argues that during his incarceration he has done what he could to work on his reintegration plan. There were some things, such as arranging for housing and employment, which it is unlikely he could have accomplished while in prison. But there were key requirements of the plan that Father could have complied with—or at least could have made a serious effort to accomplish—for which we find no support in the record.

Father was required to take parenting classes. Father was aware of a prison parenting program. This appears to be the SKIP program that Father refers to in his appellate brief. Though the program was limited (presumably in terms of attendees), there is no indication that Father made any effort to participate in this program.

Because of Father's prior involvement with illegal drugs, he was required to obtain a drug and alcohol evaluation. RADACT is a program that performs drug and alcohol evaluations for prison inmates. There is no indication that Father ever sought to participate in this program while in prison. Father also refers in his appellate brief to the behavior modification and substance abuse program called FLIP. There is nothing in the

record to indicate that Father took any steps to involve himself in this program. Given Father's involvement with illegal drugs—even while on probation—and his failure to deal with his addiction while in prison, it is not at all reasonably foreseeable that he will be able to complete his reintegration plan after being released from prison without further lapses into the use of illegal drugs.

Father's plan called for him to have consistent contact with SFM. He is critical of SFM for only calling him three times after he was imprisoned. But he had Moye's business card from the outset of the CINC proceedings, and there is no indication that he ever initiated a call to Moye. Moreover, when Moye wrote to him he never responded.

The reasonable inference one can draw from the foregoing is that Father failed to take advantage of the services that were available to him while he was incarcerated. These tasks will need to be completed later, unnecessarily delaying the time for him to be reintegrated with his child. Reintegration is further complicated by the fact that G.G. was placed in State custody when only six months old. Father has had no contact with the child since then. Unlike cases in which a parent has a significant parental relationship with the child before incarceration, and while being in prison makes regular, consistent, and meaningful contact with the child to maintain and nurture that relationship, there is no indication whether in the foreseeable future, or whether at all, Father will establish such a parental bond. Foreseeable future is determined from the child's perspective of time. K.S.A. 2020 Supp. 38-2201(b)(4); *In re M.H.*, 50 Kan. App. 2d at 1170-71. The record establishes that there was a lack of effort by Father to adjust his conduct to meet G.G.'s needs. See K.S.A. 2020 Supp. 38-2269(b)(8).

But Father argues that termination of his parental rights was not proper because the State and SFM did not exercise reasonable efforts to reintegrate him with his child. K.S.A. 2020 Supp. 38-2269(b)(7) requires the court to consider whether there was a "failure of reasonable efforts made by appropriate public or private agencies to

11

rehabilitate the family" when the issue is raised in connection the issue of a parent's fitness. Here, the district court found that SFM made reasonable efforts in this case. "The purpose of the reasonable efforts requirement is to provide a parent the opportunity to succeed, but to do so the parent must exert some effort." *In re L.C.P.*, No. 118,841, 2018 WL 4039170 at *8-9 (Kan. App.) (unpublished opinion), *rev. denied* 309 Kan. 1348 (2018).

The record shows that SFM's efforts, although not perfect, were reasonable in the face of Father's lack of cooperation and effort. Father was uncooperative from the start, refusing to sign the documents necessary for SFM to initiate its work and refusing to meet with the social workers. It was not until he was incarcerated at El Dorado that Father agreed to cooperate with SFM. We find no indication that Father's inability to make significant progress on his reintegration tasks was caused by SFM. To the contrary, it is apparent from the record that Father failed to avail himself of several key services available to prisoners that were necessary for him to progress in the performance of his reintegration plan.

Under these circumstances we conclude that clear and convincing evidence, viewed in the light favoring the State, supports the district court's termination of Father's parental rights. Due to Father's failure to cooperate, the lack of any bonding with the child, and the length of time until Father's release from prison, the district court did not abuse its discretion in its determination that it was in G.G.'s best interests for Father's parental rights to be terminated.

Affirmed.