NOT DESIGNATED FOR PUBLICATION

No. 115,533

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Interest of S.C.,
Y.O.B. 2013.

MEMORANDUM OPINION

Appeal from Johnson District Court; KATHLEEN SLOAN, judge. Opinion filed December 23, 2016. Affirmed.

*Dennis J. Stanchik*, of Olathe, for appellant, mother.

*Shawn E. Minihan*, assistant district attorney, and *Stephen M. Howe*, district attorney, for appellee.

Before HILL, P.J., PIERRON and GARDNER, JJ.

*Per Curiam*:  The district court terminated A.A.'s parental rights to her minor child, S.C. A.A. appeals and argues that (1) the court's conclusion that the conditions that make her unfit to parent S.C. were unlikely to change in the foreseeable future was not supported by clear and convincing evidence, and (2) the court abused its discretion when it concluded that the termination of her parental rights were in the best interests of S.C. We affirm the district court's findings because there was clear and convincing evidence that A.A. did not have stable housing and income throughout the 16 to 17 months of this case and she failed to complete a drug and alcohol assessment and mental health treatment. The court did not abuse its discretion when it determined it was in the best interests of S.C. to have A.A.'s parental rights terminated.

1

On January 14, 2014, Jessica Calvert, a Department of Children and Families (DCF) investigator, received a report that A.A. was possibly using drugs and was going to be evicted or banned from her mother's home due to stealing other resident's medicines and knocking on their doors in the middle of the night. Calvert attempted to schedule a home visit with A.A. at an address in Edgerton. On February 10, 2014, A.A. told Calvert she had left the address in Edgerton because she had an argument with the man she was living with, with whom she was in a relationship. At this point, Calvert did not know where A.A. was living. A.A. continued to provide different addresses and Calvert was never able to successfully walk through a residence. Calvert was concerned about housing stability.

Calvert had additional concerns for S.C. A.A. had tested positive for several drugs when she completed a urinalysis (UA) at a headache and pain center, so Calvert requested a UA from her so she could have the results. A.A. acknowledged she had tested positive for heroin, marijuana, cocaine, and methamphetamine, but she stated they were all false positives. She completed the UA requested by Calvert and tested positive for opiates and other drugs. She provided prescriptions, but the medication she reported taking would not have caused the test to come back positive.

H.C., S.C.'s paternal aunt, reported that A.A. would drop S.C. off at her home with a plan of staying a week, but frequently S.C.'s time there was extended. H.C. had been watching S.C for 3 weeks. She was concerned that S.C. had been born addicted to drugs because A.A. was on morphine and Vicodin when S.C. was born and S.C. was on medications for withdrawal at birth.

With Calvert's concerns of drug usage, testing positive for drugs, housing instability, and never being able to walk through a residence, she referred S.C. for a child in need of care (CINC) petition by the district attorney's office. On February 11, 2014,

2

the district court entered an order that S.C. be placed in the temporary custody of the Secretary of DCF.

A.A. is the mother to three girls, none of whom are in her custody. She moved back to Kansas from California in 2011 or 2012, and since then, her name has not been on a lease. She has consistently lived with other people. When she moved back from California, she was a caregiver to her mother. She did that for about 3 years and earned approximately $200 a month. Her next job was at First Student where she worked from approximately December 2014 to April 2015, before she was fired. She had lost her driver's license while in California due to child support issues. A.A. admitted she has had a history of methamphetamine use from the age 19 to 28. Due to curvature of the spine and a car accident resulting from a DUI, she has pain issues. She provided prescriptions for oxycodone, tramadol, and klonopin to KVC. She applied for disability in both California and Kansas and was denied in both states. S.C.'s father has relinquished his parental rights.

*First Reintegration Plan*

Anne Kwon, of KVC Behavioral Health Care, was S.C.'s permanency case manager from February 11, 2014, until January 7, 2015. Kwon worked on the first reintegration plan with A.A. The reintegration plan was ordered on March 11, 2014, and was for 6 months, scheduled to end in September 2014. Kwon determined the most important issues A.A. needed to work on were housing, financial stability, and getting her drug and alcohol evaluation completed. All of those were included in the reintegration plan, along with parenting classes and a psychological evaluation.

During a review hearing for the reintegration plan on June 9, 2014, A.A. had made progress on her plan, a lot of which was due to her boyfriend, J.W. She had housing and financial stability through J.W., she attended visits on time because of him, and he

transported her to complete evaluations. However, A.A. did not have any independent income.

A.A. told Kwon on October 29, 2014, that she was no longer in a relationship with J.W. In fact, A.A. admitted that she had been lying for the past 3 months about her relationship with J.W. After A.A.'s relationship with J.W. ended, she did not make much progress at all. A.A. also began having issues with positive drug tests in September 2014. She tested positive for methamphetamine and was ordered to go to Midwest Justice to take another test, which came back negative for all substances. While Kwon was on the case, A.A. tested positive for methamphetamine four times. Around this same time, A.A. lost her insurance and discontinued counseling sessions and said she could not continue to take her prescription drugs because she did not have insurance to pay for them. A.A.'s reintegration plan was extended 90 days to December 2014, and visitation was restricted.

On December 11, 2014, Kwon told A.A. she needed to provide three clean drug tests before having more visits with S.C. Kwon realized A.A. had missed the entire month of November for taking UA's, and her UA letter stated that if she missed a significant number of tests, then she would have to submit three clean UA's consistently.

A.A. never provided any proof of housing outside of J.W.'s while Kwon was on the case. She did not pay rent or help with utilities. She did not provide proof of being discharged from counseling. Kwon had concerns about the progress with A.A.'s plan since it was completely dependent upon her relationship with J.W. Kwon communicated with A.A. several times that she needed to demonstrate she could care for S.C. independently of J.W. However, Kwon never felt A.A. reached a point where she could independently care for S.C.

Kwon was concerned about A.A.'s housing, transportation, and income. It was a concern that A.A. was a methamphetamine user in the past and then was having random

methamphetamine positive UA's. There were also concerns about her UA's because she would test positive for opiates one day, and oxycodone another day, and the next time she would test positive for benzodiazepines and oxycodone and methamphetamine. The results changed almost every time she tested. There was a lack of consistency with her prescriptions and UA's throughout the case. Kwon was concerned that A.A. was misusing her prescriptions and she was going to different doctors to receive the prescriptions. While Kwon was on the case, A.A. never had a job, disability, Social Security, or any steady income. Kwon stated it was unusual to send a child back into a home that has a continuing lack of income.

*Second Reintegration Plan*

Alyssa Hillman, a KVC permanency supervisor, began working on S.C.'s case April 3, 2015. She was on the case through the entire second reintegration plan. This plan included similar requirements as the first: find suitable housing; obtain income; complete parenting classes and psychological evaluation; complete a drug and alcohol assessment; submit to UA's; provide KVC with prescription documentation; obtain a driver's license; and obtain and maintain transportation.

In Hillman's opinion, A.A. failed the second reintegration plan. A.A. had continued problems with suitable housing, obtaining income, drug tests, and visitation.

*Housing*

A.A. had lived at three different places since Hillman had been on the case. She only provided proof of living with J.W. The second location was with R.R. who worked with A.A. at First Student. The night before Hillmans' walk through of R.R.'s residence, A.A. and her mother put a few things in the room to make it look as if A.A. lived there. Hillman said it did not look like A.A. actually lived there. A.A. had told R.R. she was not

5

supposed to be staying at her mother's home because of the situation with drugs being brought in. A.A. had asked R.R. to cover for her and say she lived with R.R. when she in fact did not. This was around January 2015 to the summer of 2015.

R.R. had concerns about A.A. bringing men over when she stayed at her home. A.A. had brought over four different men. R.R. was nervous to testify at trial because A.A. had sent threats to her cell phone. R.R. received these threats when A.A. learned R.R. would be testifying in the State's case.

R.R. and A.A. had discussed A.A. moving in with her to a new home, but R.R. told A.A. she would have to pay rent and pay bills. In the past, A.A. had never contributed financially when she stayed at R.R.'s. R.R. said that A.A. would not likely move in because she did not really want to be there, she just wanted to use the house as a way to get S.C. back.

A.A. also reported living at her mother's residence. Hillman had concerns about A.A. living with her mother. A.A. was not on the lease. Her mother lived in HUD housing and was only allowed to have "two heartbeats to a one-bedroom apartment." That meant it was fine for A.A. to stay there, but S.C. would not have been able to stay there with A.A. and her mother.

A.A. also reported living with J.W. However, this housing option ended when J.W. had A.A. formally evicted from his home. J.W. reported that he and A.A. had broken up in October 2014, and from then on their relationship was on and off. He said he would only be a housing option for A.A. if they got back together.

*Income*

A.A. was employed at one job, First Student, while Hillman was working on the case. However, she never turned in any paycheck stubs or other proof of employment. R.R. was aware that A.A. had missed work for reasons like morning sickness or not wanting to go to work because she was tired. A.A. had thought she was pregnant and the father was a guy named Mike from Gardner, but it turned out she was not. A.A. was terminated from this job.

After the job at First Student, A.A. did not turn in any other employment or proof of income. She did a budget and indicated she would pay for expenses with the money her mother provided her each month. A.A.'s mother paid her about $100 a month for taking care of her. A.A. said that friends would sometimes help out with money as well. Hillman did not consider this income consistent enough to meet the needs of A.A. and S.C.

*Drug Tests*

Under the reintegration plan, A.A. was required to take random drug tests, which she did not consistently comply with. Since Hillman had been on the case, A.A. missed a total of six UA's. She had also tested positive for various drugs—oxycodone, methamphetamine, benzodiazepines, opiates, and methadone.

A.A. provided prescriptions for oxycodone and buspirone, which would test positive for opiates, and lorazepam, which would test positive for benzodiazepine. Hillman was concerned that A.A. was not taking her medications consistently. She was also concerned that three different doctors were prescribing A.A.'s medication. For a hair follicle test conducted on April 23, 2015, Hillman was concerned that the results were incorrect because A.A. had dyed her hair before the test, which could affect the results.

7

*Visitation*

Since Hillman had been on the case, A.A. had not maintained a consistent attendance with her visitation schedule. Prior to the last court hearing, July 29, 2015, there had been a total of 26 visits offered. A.A. missed eight of the visits and was late to four.

*Final Conclusion*

Since the initial reintegration plan, A.A. had 16 to 17 months to successfully reintegrate with S.C. S.C. had been in out-of-home placement since February 11, 2014. At one point during the first plan, A.A. was making progress, which is why the second plan was recommended.

S.C. has been with the same family the entire time she has been in out-of-home placement. She is comfortable with the placement and has a very strong bond with them. S.C. is intelligent for her age, at just over 2 years old.

Under the second reintegration plan, A.A. was required to obtain and maintain suitable and appropriate housing for her and S.C. She was required to provide proof of obtaining and maintaining sufficient income to meet her needs and the needs of S.C. Throughout the course of the second reintegration plan, A.A. failed to do both of these things. She also failed to provide any proof of mental health treatment or drug and alcohol treatment, both of which were requirements of the reintegration plan. Aside from attending some of her visits with S.C. and taking drug tests, A.A. did not make any progress on her second reintegration plan.

Hillman stated that, in her professional opinion, it was in the best interests of S.C. to have A.A.'s rights terminated and reach permanency through adoption because of the benefits S.C. had from having a routine. For a child her age, this kind of permanency was even more important. Hillman stated the continuing concerns with A.A. were not likely to change in the immediate or foreseeable future because of housing issues and concerns with prescription pain medication abuse and a pattern and history of lack of stability.

At the end of the 3-day trial, the district court reconvened on this matter on February 10, 2016. At that time, the judge found A.A. was not meeting S.C.'s needs and approved the permanency plan with the goal of achieving adoption for S.C. Specifically, the judge found:

> "[A.A.'s] conditions of unfitness are unlikely to change in the immediate or foreseeable future. She has no stable housing, no stable income, no drug and alcohol services, no mental health services, and no regular visitation. She has three children, none of whom are in her custody or care. She takes no responsibility for what brought [S.C.] into State custody. She has made it quite clear that she has no intention of gaining personal independence or financial independence. [A.A.] has no visible means of being in a position to care for and parent her daughter. [A.A.'s] position at the conclusion of trial was no better, and was arguably worse, than it was when the case began."

A.A. appeals and argues the district court's conclusion that the conditions rendering her unfit to parent S.C. were unlikely to change in the foreseeable future is not supported by clear and convincing evidence and the district court abused its discretion by concluding that the termination of her parental rights would be in the best interests of S.C.

The Kansas Legislature has specified that the State must prove "by clear and convincing evidence that the child is a child in need of care." K.S.A. 2015 Supp. 38-2250. In addition to child in need of care adjudications, the clear and convincing evidence

9

standard of proof applies to all termination of parental rights cases. K.S.A. 2015 Supp. 38-2269(a). Clear and convincing evidence is that "which is sufficient to establish that the truth of the facts asserted is 'highly probable.'" *In re B.D.-Y.*, 286 Kan. 686, 696, 187 P.3d 594 (2008).

K.S.A. 2015 Supp. 38-2269(a) states:

"When the child has been adjudicated to be a child in need of care, the court may terminate parental rights or appoint a permanent custodian when the court finds by clear and convincing evidence that the parent is unfit by reason of conduct or condition which renders the parent unable to care properly for a child and the conduct or condition is unlikely to change in the foreseeable future."

In making this determination, an appellate court does not weigh conflicting evidence, pass on the credibility of witnesses, or redetermine questions of fact. *In re B.D.-Y.*, 286 Kan. at 705.

When determining how to define "foreseeable future," the court examines the term from the perspective of a child. *In re M.H.*, 50 Kan. App. 2d 1162, 1170, 337 P.3d 711 (2014). Children and adults have different perceptions of time, and a child has the right to permanency within a time frame that is reasonable to them. 50 Kan. App. 2d at 1170. The district court may draw inferences from the past conduct of a parent to determine that the parent's conduct will not likely change in the foreseeable future. *In re Z.C.*, No. 97,032, 2007 WL 1310097, at *3 (Kan. App. 2007) (unpublished opinion).

A.A. argues that the record does not support the district court's finding that she had not established stable housing and stable income at the time of trial. She also argues there were no recommendations that she receive drug and alcohol services and her lack of mental health treatment does not impair her parenting abilities.

10

There is ample evidence in the record to support the district court's finding that A.A.'s unfitness as a parent is unlikely to change in the foreseeable future. For the housing requirement, she had lived in three different locations sporadically throughout the case. She only provided proof of residence when she was with J.W. The only time she demonstrated a stable living situation was when she was in a relationship with J.W. When she was not with J.W., she bounced back and forth between her mother's home, which was not a place she could live with S.C., and R.R.'s. A.A. even lied to KVC about her living situation when she brought a few items to R.R.'s for the walk through, and then removed them afterward. By the time of trial, A.A. had never obtained and maintained suitable and appropriate housing for her and S.C., which was a requirement of her reintegration plans.

For the income requirement, A.A. had never provided proof of obtaining and maintaining sufficient income to meet her needs and the needs of S.C. She was only employed at First Student for a few months. She never turned in any paycheck stubs or other proof of employment for this job. A.A. told Hillman that her mother gave her about $100 a month for being her caregiver and that friends and family would sometimes help her with money. This was not consistent enough income to meet the needs of A.A. and S.C. The only time A.A. had financial stability was when she and J.W. were together; however, it was still a concern that she did not have any independent income.

For the drug and alcohol issues, the second formal reintegration plan required that A.A. "complete a drug and alcohol assessment and follow all recommendations." Therefore, her claim that she was not required to complete drug and alcohol services is incorrect. In addition to not getting drug and alcohol treatment, A.A. had continued problems with testing positive inconsistently for her prescription drugs, which indicated she was not taking those drugs as prescribed, as well as testing positive for drugs she was not prescribed. She also took a hair follicle test, which came back negative, and there was concern that the results were incorrect because she had dyed her hair. Overall, she made

11

no progress when it came to drug and alcohol issues throughout the pendency of this case.

For the mental health services requirement, A.A. was required to complete a level I psychological evaluation and follow all of the recommendations as part of her first and second reintegration plans. She failed to provide any proof of mental health treatment. A.A. claimed her mental health had no bearing on her parenting skills, but it was impossible to come to that conclusion considering there was no mental health evaluation completed and therefore no answers determining her mental health.

Given that A.A. had 16 to 17 months to successfully reintegrate with S.C. and to obtain suitable housing, sufficient income, a drug and alcohol evaluation, and a mental health evaluation, but did not complete any of those things, there was clear and convincing evidence for the district court to find that A.A.'s unfitness would not likely change in the foreseeable future. In fact, A.A. was arguably in a worse position than she was at the beginning of the case. Therefore, the district court was correct in its conclusion and is affirmed.

A.A. finally argues the district court abused its discretion when it concluded that the termination of her parental rights would be in the best interests of S.C.

"The district court is in the best position to determine the best interests of the child because it hears the evidence directly, and the appellate court cannot overturn it without finding an abuse of discretion." *In re J.T.*, No. 114,996, 2016 WL 4414963, at *11 (Kan. App. 2016) (unpublished decision). An abuse of discretion occurs "if the action (1) is arbitrary, fanciful, or unreasonable; (2) is based on an error of law; or (3) is based on an error of fact." *Northern Natural Gas Co. v. ONEOK Field Services Co.*, 296 Kan. 906,

935, 296 P.3d 1106 (2013). The party asserting an abuse of discretion bears the burden to prove the abuse of discretion. 296 Kan. at 935.

K.S.A. 2015 Supp. 38-2269(g)(1) states:

"If the court makes a finding of unfitness, the court shall consider whether termination of parental rights as requested in the petition or motion is in the best interests of the child. In making the determination, the court shall give primary consideration to the physical, mental, and emotional health of the child. If the physical, mental, or emotional needs of the child would be best served by termination of parental rights, the court shall so order."

So, here, in order to terminate, the district court judge was required to find that it was in the best interests of S.C.

A.A. argues the district court abused its discretion by concluding that the termination of her parental rights would be in the best interests of S.C. As stated above in the first issue, as well as extensively outlined in the fact section, A.A.'s stability in terms of housing, income, and drug tests either ebbed and flowed with her on-again-off-again relationship with J.W. or, towards the end, continually got worse. At the time of trial, the district court found that based on both reintegration plans A.A. had failed all of the requirements except for taking drug tests and attending some of her visits with S.C.

There was also evidence that S.C. was doing very well at her placement. She has been with the same placement since the beginning of the case and has a very strong bond with them. She is intelligent for her age. Ultimately, Hillman said it was particularly important for a child who is just over 2 years of age to have permanency through adoption and have a solid routine. Based on both A.A.'s inability to successfully complete both of her reintegration plans during a 16-to-17 month time period and S.C.'s success at

13

placement, it is clear the district court did not abuse its discretion and termination was in the best interests of S.C.

Affirmed.