NOT DESIGNATED FOR PUBLICATION

No. 116,903

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Interests of Z.L.M. and Z.M.M.,
Minor Children.

MEMORANDUM OPINION

Appeal from Sedgwick District Court; DANIEL T. BROOKS, judge. Opinion filed July 28, 2017. Affirmed.

*Jordan E. Kieffer*, of Dugan & Giroux Law, Inc., of Wichita, for appellant natural mother.

*Laura E. Poschen*, of Wichita, for appellant natural father.

*Julie A. Koon*, assistant district attorney, and *Marc Bennett*, district attorney, for appellee.

Before BUSER, P.J., MALONE, J., and HEBERT, S.J.

*Per Curiam*: M.M. (Father) and S.L.T. (Mother) jointly appeal the district court's decision terminating their parental rights of their minor twin children born in 2012, Z.M.M., a male, and Z.L.M., a female. Father and Mother argue that the State failed to present sufficient evidence to support the district court's decision. Specifically, they argue that the State failed to establish that it made reasonable efforts towards reintegration of the family. They also argue that the State failed to present sufficient evidence to prove that their unfitness was unlikely to change in the foreseeable future. Finally, Father contends that the district court erred in finding that termination of his parental rights was in the best interests of the children. Based upon our thorough review of the record on appeal, we affirm the district court's judgment.

1

FACTUAL AND PROCEDURAL BACKGROUND

This case began in 2013 when the State filed a child in need of care (CINC) petition for the children due to concerns about Mother's drug use and that she was in and out of jail. At the time of the initial CINC petition, the children were in Mother's custody and Father—a convicted felon—was incarcerated. Mother was referred to Family Preservation Services but efforts toward reintegration were unsuccessful. Ultimately, Father was released from custody and completed all of his court orders. Accordingly, the case was closed in February 2015, and the children were reintegrated with Father.

On November 7, 2015, at approximately 5:20 a.m., Officer H.R. Huhman of the Wichita Police Department responded to the home of Z.M.M. and Z.L.M.'s paternal grandmother for a reported domestic violence disturbance. Huhman noticed Father sleeping in a vehicle outside of the house with the two children. Father told Huhman that he had been locked out of the residence because the owner did not want him there. Huhman then ran a background check on the vehicle and learned that it had been reported stolen on October 12, 2015, and Father was the suspect.

Father was arrested and a search of the car revealed drug paraphernalia, knives, counterfeit money, and a "sawed off" shotgun. Inside the residence, officers observed that there was no place for Z.M.M. and Z.L.M. to sleep and no one was willing to take the children. Father informed the officers that the children's mother was incarcerated at the Sedgwick County jail. Huhman placed Z.M.M. and Z.L.M. in police protective custody due to their parents being unable to provide proper physical or mental care.

On November 9, 2015, social worker Kena Battle interviewed Father at the jail. Father told Battle that on the night of his arrest, he and the children were sleeping in his car because when he tried to enter his mother's residence, his brother called the police. When asked about the car, Father said that he had been renting the vehicle but someone

2

else had stolen it a week earlier. However, Father was unable to provide the name of the rental company, nor had he filed a police report that the car was stolen. Finally, Father told Battle that it would be best if the children were placed with his brother and sister.

Battle also interviewed Mother at the jail. Mother told Battle that she had been incarcerated at the jail for approximately 2 months after being arrested for possession of illegal substances; she stated that she was facing a 99-month sentence. Mother recounted that her children previously had been in the State's custody, but when they were released to Father, Father let her see the children every few weeks.

On November 10, 2015, Battle filed another application for a CINC petition based on her concerns about both Mother and Father being in jail, the lack of stability for the children, Mother's drug use, and the gun and drugs found in Father's car. On November 12, 2015, the State filed a CINC petition and motion for finding of unfitness and termination of parental rights. That same day, a temporary custody hearing was held; Mother appeared but Father did not, although he had been notified of the hearing. The district court found that it was in the best interests of Z.M.M. and Z.L.M. to remain in temporary State custody in an out-of-home placement.

In December 2015, Mother attended a case plan meeting and developed a reintegration plan with St. Francis Family Services. Mother was no longer incarcerated at that time. However, on February 9, 2016, Mother tested positive for methamphetamine and her probation was revoked. According to Mother, she was to remain incarcerated until a bed was available at an inpatient treatment center.

The termination hearing was held on March 28 and 29, 2016. At the time of the hearing, Mother was incarcerated at the jail. Father had been out of jail for a week at the time of the termination hearing. Z.L.M.'s therapist, Hannah Van Horn, testified first. Van Horn stated that she began seeing Z.L.M. in January 2016 after Z.L.M. made allegations

3

of sexual abuse against Father. Van Horn diagnosed Z.L.M. with adjustment disorder stemming from Z.L.M.'s difficulty in adjusting to the changes in her environment. Specifically, Van Horn testified that Z.L.M. was having trouble sleeping, exhibiting boundary issues, and having temper tantrums where she would bite and scratch herself. Van Horn stated that Z.L.M's prognosis was good as long as she remained in a stable home with a consistent place to live, income, and caregiving.

Battle testified next. She stated that in 2013, she filed a CINC application for Z.M.M. and Z.L.M. when they were residing with Mother based on concerns about Mother's drug use and her being in and out of jail. Father was incarcerated during this time. After she filed the CINC application, Battle explained that she no longer had contact with either Mother or Father until she filed the most recent CINC application in 2015. When asked at the time of filing the application whether she believed the children were in need of care, Battle became emotional and started to cry. She explained that she was upset because this was a termination hearing; she had had no contact with the family after filing the CINC application, and she was surprised that Z.M.M. and Z.L.M. were not reintegrated with their parents or placed with relatives. Battle did, however, make clear that after the temporary custody hearing, she had no contact with the family and had no information about the progress of either Father or Mother. Battle confirmed that when she filed the CINC application, neither Father nor Mother were able to parent the children.

Mother testified next. She stated that she had been residing at the jail since her probation was revoked because a UA revealed the presence of methamphetamine. Mother admitted to last using methamphetamine on March 12, 2016. She testified that she was unsure when she was going to be released and that she was waiting on a bed at an inpatient treatment center. Mother testified that she has five children, including one child she gave up for adoption in 2014. Mother recalled the 2013 CINC case and that Z.M.M. and Z.L.M. were removed from her home because of her drug use and her inability to keep a stable home. She acknowledged that she did not complete her court orders in that

4

case and that the children were placed in the custody of Father. Mother stated that prior to her most recent probation revocation, she was living off and on with a friend. Father allowed her to see the children whenever she wanted to see them. Mother stated that she started going to outpatient treatment at the Miracles treatment center in January 2016.

Mother also testified that she previously had attended four drug treatment programs, but she only completed two successfully; her last successful treatment was in 2012. Mother acknowledged that she did not initially think she needed inpatient treatment but changed her mind after experiencing a relapse in January 2016. Mother stated that she relapsed because of the stress of the CINC case and the possible termination of her parental rights. She also stated that she lacked a support system and that also contributed to her relapse. Mother believed that she would not relapse if she attended inpatient treatment because she would use the tools she learned and find a support system.

Finally, Mother stated that she would successfully maintain her sobriety because she believed she was facing an 8-year prison sentence if she failed to do so. Specifically, Mother told the court that she had served 2 months of a 3-year probation sentence with community corrections that had an underlying sentence of 8 years' imprisonment based upon her drug conviction. Mother also informed the court that she was serving another term of probation for traffic offenses, and her current incarceration was because she failed a UA and violated the terms of that probation. Mother explained that the consequences of that failure was that she had to attend inpatient treatment. Mother's plan after completing inpatient treatment was to live with her mother, a recovering addict, in a one-bedroom home. Mother also planned on getting a job but stated that she was last employed in 2012 for a period of 2 months. Prior to that, she had a job as a maid for 2 years when she was 16; Mother was currently 29 years old. The longest period of time Mother had cared for Z.M.M. and Z.L.M. since the last CINC case was for a few days.

Susan Summers, Mother's addiction counselor at Miracles outpatient treatment center, testified next. Summers began working with Mother in December 2015 when she was admitted to outpatient treatment. Summers was aware that Mother's children were in State custody. In February 2016, Summers recommended inpatient treatment for Mother because of the level of her use of methamphetamine. Summers testified that Mother was frequently absent from therapy sessions while in outpatient treatment.

Father testified next. He stated that he currently was living with his brother, but he planned to start working and find housing. Father testified that when the children were reintegrated with him after the prior CINC case, they were living in a house next to his mother's home. He moved in August 2015, however, because a sewer line collapsed and the landlord refused to fix it. After that, Father explained, he and the children stayed in various hotels for the next few months.

Father stated that his mother would allow Z.M.M. and Z.L.M. to sleep at her home, but Father would have to leave and return in the morning. The children slept in the living room on the couch. Father also testified that on the night the children were placed in police protective custody, they were sleeping in the car because his brother had refused to let them inside his mother's house. According to Father, after the police arrived, he was arrested on a municipal warrant for a failure to appear. He was also charged with new crimes because the police found a firearm in the trunk as well as drugs. Father pled guilty to those charges. Father also stated that he had a criminal case for firearm and drug charges from 2015 and that case was consolidated with his 2016 case. Father testified that he was awaiting sentencing in both cases at the time of the termination hearing.

Father also testified that he did not contact his children after they were placed in police protective custody because he knew he had active warrants and was afraid if he tried to visit them, he would be arrested. He also stated that he missed the temporary custody hearing because Battle was unable to reach him to inform him of the date

6

because his phone had been stolen. Father stated that he had been incarcerated three times between the filing of the 2013 CINC petition and the time of the termination hearing. He also indicated that he used marijuana prior to his arrest in January.

Christy Hannon, a St. Francis Community Services family support worker assigned to the case, testified next. Hannon testified that Mother's first supervised visitation with the children occurred in December 2015. Hannon did not have any concerns about the way Mother interacted with the children. However, Mother was not always on time, she cancelled two visits and rescheduled three visits. Hannon had never supervised a visitation between Father and the children because at the beginning of the case they were unaware of Father's location and, when they did locate him in January 2016, he was in jail. The children never spoke about Father during any of the visits Hannon supervised. Hannon testified that in order for Mother's interactions to no longer be supervised, she would have to test clean for methamphetamines and start complying with the court orders. Mother also would have to have her own housing, employment, and ensure that the children would attend preschool or kindergarten.

As to Father, Hannon stated that in order to move forward with visitation, Father would have to engage in court orders and services, obtain a clinical assessment, a substance abuse evaluation, and a UA and hair follicle test. Hannon recalled meeting with Father at the jail in February 2016. To her knowledge, Father never requested visitation with his children, and he never contacted St. Francis to inquire about his children. Hannon stated that St. Francis' policy is not to have parents arrested on warrants during visitation and she had never denied visitation to a parent because of an active warrant.

Ursula Machutta, Father's sister-in-law, testified that Father had been staying with her and her husband for about 3 or 4 days since his release from jail. Father's mother, Patricia Machutta, testified that Father was not allowed to stay the night at her house, but she would take the children and let them sleep on the couch. She stated that on the night

7

the children were placed in police protective custody, she had called the police because she had been in an argument with Father and would not allow him into the house.

Finally, Heather Wood, the St. Francis case manager assigned to the case, testified. Wood testified that she met with Mother on December 3, 2015, to go over the court orders and the case plan. She stated that the case plan was influenced by the 2013 CINC case because they looked at the patterns of behavior and recurring issues that needed to be addressed in order to return the children to their parents. The Mother's case plan focused on the court's drug and alcohol-related orders because of Mother's extensive history of methamphetamine use. Wood opined that she was concerned about Mother's ability to maintain her sobriety. To recommend reintegration, Wood stated that Mother would need to get a job, go to inpatient treatment, and maintain sobriety for at least 6 months. Mother also would need to develop a support network, attend AA and NA meetings, seek individual counseling, and not have any more violations of her probation.

Regarding Father, Wood testified that to recommend reintegration, they would have to address the open investigation into the allegations of sexual abuse against him. He would also need to complete a psychological evaluation, obtain stable housing, obtain stable employment, take a parenting class, undergo a substance abuse evaluation, and complete UAs and hair follicle testing. Wood acknowledged the short timeframe of this case but explained that because this was not a first-time case, they were looking at patterns and secondary changes from the first case to the second case. Wood stated that they also considered "child time" when recommending termination of parental rights because of the children's need for stability and permanency and the significant amount of time the children already had spent in the foster care system.

Wood opined that Mother had not shown her ability to care for her children because the issues in the 2013 case were still present in this case. Specifically, Mother was still using methamphetamine and she still demonstrated a lack of judgment as shown

8

by her frequent incarcerations. As to Father, Wood also believed him unable to care for his children because he was still having legal issues, he was being investigated about allegations of sexual abuse, and he was only now starting to complete the court orders. Wood expressed concern that although there was a prior CINC where Father completed all the court orders, only 9 months later the children were back in police protective custody. Wood recommended termination of both Father and Mother's parental rights, stressing the children's need for permanency and stability.

After hearing the evidence and arguments of the parties, the district court terminated Father and Mother's parental rights, explaining:

> "The question is—and, really, in the present circumstances, there is absolutely no problem for the Court in finding them unfit. Neither one of them is in any position to take care of these children right now. The question in this case is not really the present but the future and can we foresee it. . . .
>
> ". . . I think the state has borne its burden of showing—and the other case I'm not taking many details from it at all—the children were Children in Need of Care. Mother had drug problems. Father had criminal problems.
>
> "The case is the same today. There is no real change in the parents except insofar as they say and they want me to believe and take them at their word that they mean it enough that they're going to be able to change themselves in the future.
>
> . . . .
>
> ". . . I like you fine, but you've left these kids in a hell of a fix, okay? Literally, you're in prison. You've been in prison. Both of you—and it's not just the fact that you've been in prison, it's that for the next several years both of you are going to be at extreme risk of being whisked away, okay, maybe because of something you did, maybe not; you're under suspicion.
>
> "But also in your testimony you admit mistakes and you've learned in a way, but neither of you has yet shown any good judgment. . . .
>
> . . . .

"Based on your present course of action, I do not see that the state is wrong in saying that you're unlikely to change in the foreseeable future, and these children need to change now and they need to start banking on that.

"I'm, therefore, going to find that each of the parents is unfit by reason of conduct or condition that renders the parent unable to properly care for each of these children, and that that condition—conduct or condition is unlikely to change in the foreseeable future.

"I am considering all the factors in 38-2269, but it says I'm not limited to them. Under the area of emotional illness I don't know what lack of judgment is called, it is a matter of—I don't want to call it Personality Disorder. It is an inability to make sound choices, so I will find it under subsection (1) giving that interpretation to it.

"With regard to mother, subsection (3), the use of intoxicating liquors or narcotics of such a duration and nature to render the parent unable to care for the ongoing needs, subsection (3).

"With regard to subsection (5), the Court adds to that that felony imprisonment— father is not actually now imprisoned, but his criminal behavior and lack of judgment and being able to avoid it and the associated risk of continued imprisonment render him unlikely to be a fit parent in the foreseeable future.

"I am going to find that in all the facts and circumstances of this case, the shortness of time, the state was not obligated to show a long course of reasonable efforts on its own part given these parents' history and situation and condition.

"I am going to find that particularly in light of the best interests of the children, it's best that parental rights be terminated and that I'm giving primary consideration to the mental and emotional health of the children, and that their right—their interests would be best served by termination and I am ordering that. I'm placing them in the custody of the Secretary for permanency."

On April 27, 2016, a journal entry was filed terminating the parental rights. In the journal entry, the district court found Mother and Father to be unfit under K.S.A. 38-2269(b)(1); (b)(3); (b)(5) and (b)(7). The district court also found that Mother and Father's unfitness was unlikely to change in the foreseeable future and that termination of parental rights was in the best interest of Z.M.M. and Z.L.M. Mother and Father timely appealed the district court's judgment.

10

Kansas follows a two-step process to terminate parental rights. First, the court must find parental unfitness:

> "When the child has been adjudicated to be a child in need of care, the court may terminate parental rights or appoint a permanent custodian when the court finds by clear and convincing evidence that the parent is unfit by reason of conduct or condition which renders the parent unable to care properly for a child and the conduct or condition is unlikely to change in the foreseeable future." K.S.A. 2016 Supp. 38-2269(a)

If the court makes such a finding, the court then shall consider whether termination of parental rights is in the best interest of the child. K.S.A. 2016 Supp. 38-2269(g)(1). Accordingly, the district court here made two separate findings: first, that both Father and Mother were unfit parents and that unfitness was unlikely to change in the foreseeable future, and second, that terminating Father and Mother's parental rights was in the best interests of Z.M.M. and Z.L.M.

The standard of review for the district court's finding of unfitness is well known; because the district court may only make a finding of unfitness based on clear and convincing evidence, an appellate court must determine whether clear and convincing evidence supports the district court's finding. *In re R.S.*, 50 Kan. App. 2d 1105, 1113, 336 P.3d 903 (2014). To do so, the appellate court determines whether the evidence, when reviewed in the light most favorable to the State, could have convinced a rational factfinder that the truth of the facts asserted was highly probable. *In re B.D.-Y.*, 286 Kan. 686, 705, 187 P.3d 594 (2008); *In re R.S.*, 50 Kan. App. 2d at 1113. Whether termination is in the best interest of the child is reviewed for an abuse of discretion because the district court is in the best position to evaluate the "complexities of the situation" and the needs of the children. 50 Kan. App. 2d at 1115.

11

*Is there clear and convincing evidence that Father and Mother were unfit and their unfitness was unlikely to change in the foreseeable future?*

Before terminating parental rights, K.S.A. 2016 Supp. 38-2269(a) requires that a district court "find[] by clear and convincing evidence that the parent is unfit by reason of conduct or condition which renders the parent unable to care properly for a child and the conduct or condition is unlikely to change in the foreseeable future." The idea of "the foreseeable future" is considered from a child's perspective "because children and adults have different perceptions of time and children have a right to permanency within a time frame reasonable to them. [Citations omitted.]" *In re M.H.*, 50 Kan. App. 2d 1162, 1170-71, 337 P.3d 711 (2014).

K.S.A. 2016 Supp. 38-2269 contains a nonexclusive list of factors a district court shall consider when making a fitness determination, including any emotional, mental, or physical illness that renders the parent unable to care for the child; the use of narcotic "drugs of such duration or nature as to render the parent unable to care for the ongoing physical, mental or emotional needs of the child"; "conviction of a felony and imprisonment"; "failure of reasonable efforts made by appropriate public or private agencies to rehabilitate the family"; "lack of effort on the part of the parent to adjust the parent's circumstances, conduct or conditions to meet the needs of the child." See K.S.A. 2016 Supp. 38-2269(b)(1), (3), (5), (7), and (8).

Here, the district court found Father unfit under subsection (b)(1) and (5). The district court found that Father's demonstrated "lack of judgment" was equivalent to an emotional illness rendering him unable to care for Z.M.M., and that although Father was not presently incarcerated, he was at a continued risk of imprisonment due to his ongoing criminal cases. As to Mother, the district court found that her lack of judgment and "inability to make sound choices" constituted an emotional illness under subsection (1). The district court found that subsection (3) applied to Mother because of her persistent

12

drug abuse. The district court also found that both Father and Mother were unfit under K.S.A. 38-2269(b)(7), as there was a failure of reasonable efforts made by appropriate public or private agencies to rehabilitate the family. Finally, the district court found that based on Father and Mother's failure to address their ongoing issues, their unfitness was unlikely to change in the foreseeable future.

Father and Mother both argue that there was insufficient evidence to support the district court's findings of unfitness and that their unfitness was unlikely to change in the foreseeable future. We agree with both Father and Mother that there was not clear and convincing evidence that the parents' "lack of judgment" was equivalent to an emotional illness rendering the parents unable to care for the children. Thus, we agree with Father and Mother that there was insufficient evidence to support the district court's finding of unfitness under K.S.A. 2016 Supp. 38-2269(b)(1).

However, as to the district court's remaining findings, we conclude that clear and convincing evidence supports the district court's determination that Father and Mother were unfit and that their unfitness was unlikely to change in the foreseeable future. As to Father, only 9 months after being reintegrated with the children, the police found Z.M.M. and Z.L.M. sleeping in Father's car—which had been reported stolen—and contained drug paraphernalia, a "sawed off" shotgun, and counterfeit money. Father was arrested and pleaded guilty in two felony cases for possession of methamphetamine and criminal possession of a weapon; he was awaiting sentencing at the time of the termination hearing. Father also was incarcerated during the initial hearing and failed to have any contact with Z.M.M. and Z.L.M. while they were in State custody during the pendency of this matter. At a minimum, there was clear and convincing evidence of Father's unfitness under K.S.A. 2016 Supp. 38-2269(b)(5).

Moreover, the record demonstrates by clear and convincing evidence that Father's unfitness was unlikely to change in the foreseeable future. This was the second time his

13

children had been adjudicated children in need of care and, between the two proceedings, nothing had changed. Father continued to demonstrate poor judgment and instability by failing to have permanent housing and continuing to commit crimes. Furthermore, due to Father's pending criminal sentencing, he was at high risk for future incarceration.

As to Mother, the record shows an extensive history of drug abuse. Mother failed to reintegrate with the children because of her drug problems in the first CINC case. When the children were placed in Father's custody after the first CINC case, Mother still failed to maintain sobriety. At the time Z.M.M. and Z.L.M. were placed in police protective custody in the second case, Mother was in jail for drug-related charges. In the 4 months before the termination hearing, Mother had two positive UAs for methamphetamine, stopped participating in drug treatment, and was incarcerated for a probation violation for testing positive for methamphetamine. Mother continued to use drugs even after she was explicitly told that she needed to remain sober in order to retain her parental rights. There was clear and convincing evidence of Mother's unfitness under K.S.A. 2016 Supp. 38-2269(b)(3) because of her drug usage and that her unfitness was unlikely to change in the foreseeable future.

*Did the State make reasonable efforts towards reintegration?*

In the journal entry of judgment, the district court found both Father and Mother to be unfit under K.S.A. 2016 Supp. 38-2269(b)(7) based on failure of reasonable efforts made by appropriate public or private agencies to rehabilitate the family. Father and Mother both argue that there was insufficient evidence to support this finding. Specifically, both Father and Mother argue that the State failed to make reasonable efforts towards reintegration. They contend that the 4 months afforded to them to comply with their case plans was an insufficient amount of time, so there was insufficient evidence that their unfitness was unlikely to change in the foreseeable future.

14

The State points out that this was the second CINC case filed against the parents in 2 years. The State also points out that during the time afforded for reintegration in the second case, both parents repeatedly failed to comply with the reintegration plan. Accordingly, the State argues that it made reasonable efforts towards reintegration even though it only afforded Father and Mother 4 months to do so.

As the State points out, while the revised Kansas Code for Care of Children requires the appropriate agencies to expend reasonable efforts towards reintegrating children with their parents, it does not require them to make "a herculean effort to lead the parent through the responsibilities of the reintegration plan. [Citation omitted.]" See *In re B.T.*, No. 112,137, 2015 WL 1125289, at *8 (Kan. App. 2015) (unpublished opinion). Here, there was clear and convincing evidence over the course of the two CINC cases that the State had made reasonable efforts to rehabilitate the family and those efforts failed.

Regarding Father, the State made an adequate effort towards reintegration, but it was Father's incarceration that prevented him from completing the reintegration plan. Father failed to provide stable housing for the children and they were found living in a car when the second CINC case was initiated. The testimony at trial revealed that Father would have to complete at least eight tasks before reintegration could possibly occur. The children had already spent more than half their lives in the foster care system and had been returned to state custody a mere 9 months after the last time they were reintegrated with Father. Father's behavior between the two proceedings showed he had made no changes; the district court was justified in finding that waiting for Father to attempt to complete his lengthy list of tasks was too much to ask of Z.M.M. and Z.L.M. See *In re D.T.*, 30 Kan. App. 2d 1172, 1175, 56 P.3d 840 (2002).

The same reasoning applies to Mother. The State attempted a reintegration plan with Mother in the first CINC case but she failed to complete the tasks of reintegration.

15

The State also attempted a reintegration plan with Mother in the second case. However, in the mere 4 months between the children's removal from Father's custody and the termination hearing, Mother had two positive UA's and she had stopped going to treatment. Though Mother stated she was enrolled in a more intensive treatment program, the State was not required to take Mother's word that she would complete treatment this time around when her prior behavior indicated the contrary. Mother failed to provide stable housing for the children during both cases and she had only been employed for a period of 2 months over the last several years. Based on all the circumstances, 4 months was a sufficient amount of time for the State to attempt to reintegrate Mother with Z.M.M. and Z.L.M. See *In re D.W.*, No. 110,759, 2014 WL 1708207, at *5 (Kan. App. 2014) (unpublished opinion) (Mother's 4-month and 2-month reintegration plans were sufficient for the State to attempt reintegration when considered in child time).

*Did the district court err in finding that termination of parental rights was in the best interests of Z.M.M. and Z.L.M.?*

Finally, Father contests the district court's finding that termination of his parental rights was in the best interests of Z.M.M. and Z.L.M.; Mother does not take issue with this finding. Specifically, Father argues that the evidence presented at the final hearing established that Z.M.M. and Z.L.M. were always safe and well cared for while in Father's care. The State, in turn, argues that the district court did not abuse its discretion when it found that based on Father's past conduct and pending criminal cases, termination of his parental rights was in the best interests of the children.

If the district court finds parental unfitness that is unlikely to change in the foreseeable future, the court is to then determine whether termination of parental rights is in the best interests of the children. K.S.A. 2016 Supp. 38-2269(g)(1). In making this determination, the court gives primary consideration to "the physical, mental and emotional health of the child." K.S.A. 2016 Supp. 38-2269(g)(1). The court is also to

16

consider the benefits of permanency in the children's lives. *In re K.R.*, 43 Kan. App. 2d 891, 904, 233 P.3d 746 (2010).

Here, the district court specifically found that Z.M.M. and Z.L.M.'s need for permanency and stability outweighed any potential negative effects of terminating Father's parental rights. This was the second time in the children's 3 years of life that they were in the custody of the State and they have now spent over half their lives in foster care. The evidence showed that Z.L.M. had started demonstrating attachment and anger issues. Wood testified that both children urgently needed a stable and permanent home. Father was awaiting sentencing in two criminal cases, he did not have a permanent home, he did not have fulltime employment, and he had not visited his children since they were placed in police protective custody. Father's repeated patterns of behavior clearly showed that he was unable to maintain stability for the children or stay out of criminal trouble. The district court did not abuse its discretion in finding that termination of Father's parental rights was in the best interests of Z.M.M. and Z.L.M.

Affirmed.