NOT DESIGNATED FOR PUBLICATION

Nos. 119,101
119,102

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Interests of K.H. and S.G.,
Minor Children.

MEMORANDUM OPINION

Appeal from Ellsworth District Court; STEVEN E. JOHNSON, judge. Opinion filed September 14, 2018. Affirmed.

*M. Levi Morris*, of M. Levi Morris Attorney at Law, LLC, of Lyons, for appellant natural mother.

*Paul J. Kasper*, county attorney, for appellee.

Before ATCHESON, P.J., HILL, J., and STUTZMAN, S.J.

PER CURIAM: Claiming that a statutory presumption of unfitness to parent did not apply to her case, the mother of two children appeals the severance of her parental rights. She also contends that there was insufficient evidence to prove her unfit to parent, that she would remain unfit, and termination of her parental rights was in the best interests of the children. At oral argument, the State conceded that the statutory presumption Mother complains about does not apply but insists the evidence compels the termination of this woman's parental rights. With the State's concession that the presumption does not apply, we address only Mother's claim that there is insufficient evidence. Our review of the record leads us to conclude that the district court's termination was supported by clear and convincing evidence. We affirm the termination of Mother's rights.

1

*Mother's beating of another child in her custody caused the filing of these two cases.*

Since we must deal solely with an issue of the sufficiency of the evidence, we relate more than a mere summary of the details. In October 2015, the State charged Mother with aggravated battery for injuries suffered by a three-year-old child in her custody. Mother was also subject to warrants in three other criminal cases. Before this time, Mother had a misdemeanor criminal history. After her arrest, Mother remained in custody while her criminal charges were pending. There were more children in the home: K.H. and S.G., subjects of these consolidated appeals, and A., who is not part of this litigation.

With mother remaining in jail, the State filed a pair of child in need of care petitions along with motions for temporary custody asking the court to remove K.H. and S.G. from her home. The court appointed a guardian ad litem for each child: Candace Bridgess for K.H. and Donald Anderson for S.G.

Eventually, after the children were adjudicated children in need of care, the district court ordered St. Francis Community Services to make a case plan and consider as factors in that plan Mother's pending criminal charges and a possible divorce from Father.

While Mother was in jail pending disposition of the aggravated battery charge, she was convicted of battery for throwing tea on a jail guard. After spending ten months in jail, Mother decided to plead no contest to a charge of aggravated battery, a felony, for the injuries she inflicted on her stepchild. She was convicted, sentenced, and then released from jail after the court placed her on two years of community corrections supervision. At this point, Mother began supervised visits with K.H. and S.G.

2

In September 2016, Amanda Parsons, a mental health therapist at Mindful Matters in Salina, began working with Mother as her individual therapist. Then, in October, Parsons began seeing Mother and the two children in family therapy. After Mother's release from jail, the court ordered continued supervised therapeutic visitation, but the children were not to be reintegrated with Mother without further orders from the court.

We note that at Mother's December 2016 psychiatric evaluation, she did not tell the evaluator the true nature of her aggravated battery conviction. Rather than telling the evaluator the victim was a three-year-old child, Mother said it was her ex-husband. Mother testified at her termination hearing, "I don't recall my exact words to [the evaluator], but I was a little reluctant to portray myself as the monster that everyone believes that I am, so I was deeply ashamed of it and I kind of shrugged it off." Mother also acknowledged that she told the psychiatric evaluator that she was convicted of aggravated battery and was in jail for 10 months, "but that's all the further I divulged to her."

Following a court review in January 2017, the district court ordered continued supervised visits with Mother and the children as recommended by the family therapist. St. Francis continued to have discretion in placement and visitation. During two January 2017 therapy sessions, Parsons became concerned for K.H.'s safety because Mother was yelling and cussing at the child. Mother accused K.H. of saying things just to upset her. One session ended early because Mother was upset and unable to calm down.

A few weeks later, Parsons discussed with Mother that she should begin individual therapy sessions with another therapist at the practice. Parsons observed that Mother used her individual sessions to process what occurred in the family sessions. Mother was not open to processing her own issues and did not make progress toward her individual treatment goals. Parsons continued to see Mother individually until early March 2017.

The last recommendation Parsons made to Mother was to proceed with individual therapy, make some progress, and then revisit family therapy.

After working with Mother and the children for about seven months, Parsons' report for the next review hearing stated that Mother was making progress with the children. But Parsons did not believe she was making any individual progress in therapy.

The next day, while at St. Francis, Parsons saw Mother interact with her child A.'s foster mother. The foster mother believed that a flower Mother gave to A. caused an allergic reaction in the child's eye. Parsons noted how the interaction escalated. Mother became upset with the foster mother, which in turn, upset K.H. But K.H. did not tell Parsons just how upset she was until a couple of weeks later. She was not willing to talk about upsetting things in front of her mother because it might make Mother angry. After this session, Parsons chose to meet only with K.H. in the April 18 session. K.H. was then more comfortable being honest with Parsons about her feelings.

After Parsons submitted a generally favorable April report, the district court granted St. Francis discretion to increase visits between the children and Mother. Following this review hearing, Mother began having some limited unsupervised visits with the children in her home for up to two hours per visit.

As therapy continued, K.H. became more comfortable in expressing her feelings and thoughts. But Parsons' opinion changed about whether Mother was going to be able to put the children's safety and their needs before her own. Parsons noticed a strained and superficial relationship between Mother and K.H. When Parsons tried to help Mother process K.H.'s feelings in family therapy, it did not go well. Mother could not empathize with K.H. Mother was unwilling to discuss how K.H. had not felt safe in the past. Nor was Mother willing to change so that K.H. would feel safe in the future. In one conversation, K.H. expressed how she was afraid of Mother going back to jail.

4

Unfortunately, Mother was unable to tell K.H. that she would try *not* to make choices that would send her back to jail. At another session, Parsons tried to explain to Mother how K.H. felt when she saw Mother get upset. Unmoved, Mother was "unapologetic and not remorseful," and had no empathy for K.H.'s fear. After Parsons met with Mother and K.H. for a family therapy session in April 2017, she spoke to St. Francis about her growing concerns. Around this time, Mother began an anger management program.

The situation deteriorated. The next month, Mother made threats against certain St. Francis staff members. Because of the threats, Mother was again arrested. Mother remained in jail until she entered a no contest plea to one count of making a criminal threat, a felony. The court once again placed Mother on probation with community corrections.

After this arrest, and based on the recommendation of Parsons, St. Francis suspended visitation between Mother and the children. The visits were suspended until Mother reentered individual therapy and her therapist recommended she was ready to begin visits again. As a result of her May arrest, Mother lost her job and her residence.

In her final report for St. Francis, Parsons stated that Mother struggled to understand the depth of change necessary on her part to care safely for her children. She did not understand that she needed to rebuild the relationships with her children and take responsibility for her past actions. Parsons observed that K.H., now 11, realized the vast changes Mother would need to make in order to care for her and the other children and keep them safe. Parsons questioned Mother's ability to make those changes. According to Parsons, those changes included making choices that would keep the children safe, regulating her own emotions, and regulating her reactions to her environment and the people around her. If she could do this, Mother could show the ability to take responsibility for her actions.

5

After the review hearing, the court ordered Mother to participate in individual therapy. The court suspended her visits with K.H. and S.G. until the therapist believed Mother was taking responsibility for her behavior and could contain her anger. The court suggested a need for a safety plan, but also noted that reintegration might still be possible. Parsons received a telephone call in June 2017 from Mother's new therapist at an agency in Hays. She told Parsons she was not recommending family therapy at that time. Parsons took this to mean that Mother had not made significant enough progress to restart family therapy sessions.

At a permanency hearing in September 2017, Thera Freeborn, a St. Francis case manager, testified that she was assigned to the case around the time of Mother's arrest in May. Freeborn testified that in her opinion, reintegration was no longer viable because the children had been out of the home for 22 months and St. Francis had not seen significant progress in Mother to return the children to her home soon. Mother's therapist also expressed concerns about her lack of progress. St. Francis did not consider reintegration possible because Mother was still unable to control her anger.

St. Francis expected Mother to take responsibility for her actions by acknowledging why the children were removed from her home and learning to control her anger. Based on her conversations with the children, Mother's support workers, and the therapist, Freeborn testified that the children needed to believe Mother recognized what she did to put them in this situation. Freeborn reported that both children expressed strong opinions about not wanting to return to their mother. This view was not well received by Mother. When Freeborn testified about the children's perceptions, Mother exploded:

> "[FREEBORN]: Well, they have both said that they don't trust their mother. [S.G.] said that she believes her mom could stab them.
> "[MOTHER]: Bullshit, Bitch.

6

"[MORRIS]: Hey, you need to not have an outburst, okay?
"THE COURT: Okay. Are you done?
"[MORRIS]: No, sir. I'm just trying to have a moment to let my client exhale and realize that she needs to not have any outbursts before I start again, Judge."

Freeborn knew that Mother began attending an anger management program about one week before the hearing. She noted that this was Mother's second attempt at anger management. The first try was not completed because of her arrest in May. A report from Mother's therapist showed she had not yet completed an anger management course, which was required before resuming any visits with her children.

Freeborn testified that Mother restarted therapy again in mid-September, contemporaneously with the reintegration viability hearing. Mother was also reportedly receiving treatment for posttraumatic stress disorder. Freeborn testified that at her last meeting with Mother in August, she emphasized the importance of Mother continuing with therapy. Freeborn also testified that Mother had a pending probation violation motion in Ellsworth County but she could not elaborate on the details because she only knew what Mother had told her.

For her part, guardian ad litem Bridgess observed that Mother's conduct in May caused parts of the case to "totally reboot" after 22 months. She argued that Mother had not shown "continuity of being able to control her anger and her outburst[s]." She observed that nothing had changed after nearly two years of 60- and 90-day reviews. Also, Bridgess argued that "kid's time" was a factor for the court to consider, and specified that the court's order had been to follow the therapist's recommendations. She contended that reintegration was no longer viable.

Mother's attorney acknowledged, "This case was headed towards reintegration until [Mother] lost her cool and got angry with some service providers." But he

7

characterized the issue as an isolated incident, "[I]t seems . . . just because she got really pissed off some day and screamed at some people . . . [St. Francis] decided [reintegration was not viable]." He suggested that Mother was in danger of losing her parental rights because the staff at St. Francis took Mother's threats in May personally: "But for one day we wouldn't be here. But for the day [Mother] blew up at some people and their feelings were hurt . . . ."

After hearing all of this, the district judge noted that he had been involved with this case from its start. He stated, "I don't feel we're any closer today than we were two years ago." The judge observed the history of Mother starting her case plan and then quitting. "With enough pressure, she starts again." The district court found that despite the reasonable efforts of various agencies to assist and support the family, the goal of reintegration was no longer viable. The district court also acknowledged that it could no longer put any restrictions on Mother or "make her do something one way or another," but stated that it would be in her best interest to "do these things." This hearing led directly to the filing of the motion to terminate parental rights.

Nearly two years after the children were removed from Mother's custody, the State moved for the court to find Mother unfit and asked the court to terminate her parental rights. The court hearing on the State's motions to terminate Mother's parental rights was held in January 2018 more than 26 months after the children were removed from Mother's custody. The court took evidence on the motions.

Crystal Smith, a reintegration supervisor at St. Francis, testified there had been five case plans since the children's cases were opened, with the most recent one following the district court's determination that reintegration was not viable. Smith had been working with Mother on seven case-plan goals, which required that she:

(1) Establish and maintain safe and drug-free housing, subject to background checks of any roommates, and walk-through inspections;

(2) follow the recommendations from the December 2016 psychiatric evaluation, which showed she would benefit from psychotherapy, Dialectic Behavioral Therapy and family therapy;

(3) complete anger management;

(4) will not use physical discipline on any of her children;

(5) will participate in mental health services and take any prescribed medications;

(6) will participate in family therapy once anger management is complete and a safety plan is in place, and follow all therapeutic recommendations; and,

(7) follow all conditions of probation with no negative contact with law enforcement.

Smith then testified about how Mother was doing in meeting those goals:

- As of October 2017, Mother had verified housing that met the case plan goals.

- Mother had attended therapy consistently since September 2017; however, she was not participating in a DBT group, which was strongly recommended. Mother continued to struggle with her anger and said she did not learn anything from her anger management course.

- Records indicated Mother completed an anger management course on December 5, 2017, but Smith had not received any verification.

- Smith noted that the plan to not use physical discipline on the children had been followed since Mother had not had any visitation with them.

- Smith testified that Mother's last medical evaluation was in November 2017, and she was unaware of any prescriptions for Mother.

9

- Although the file indicated anger management was likely complete, Smith noted that St. Francis had not yet received a recommendation from a therapist to resume family therapy. Smith did not address whether Mother had completed a safety plan.
- Smith was unaware of any negative contact with law enforcement since Mother's September 2017 pending probation violation.

Smith knew that Mother was attending a PTSD group, but she could not offer an assessment of whether such a group was an appropriate substitute to the recommended DBT group.

*Mother's testimony*

At the termination hearing, Mother did not acknowledge the reasons why K.H. and S.G. were removed from her home. Instead, Mother testified that the children were removed simply because she was in jail and unable to care for them. Also, Mother denied that the charge of felony aggravated battery involved a child. She said she pleaded to an aggravated battery felony, "Nothing more than that." When pressed, Mother named the victim—C.G. When asked if C.G. was a child at the time, Mother responded, "He was a child, but if you expect me to portray myself as a child abuser to the common community, that's not going to happen."

She was guarded in her testimony. Mother, at first, refused to answer questions about C.G.'s injuries: "I'm sorry, but you're going to have to look that up with the court report that I testified on there. I'm not going to retestify [*sic*] in this case. I testified once to it already. I'm not going to be put on the stand for that case again." After the court ordered her to answer, Mother responded, "Okay. Well, I lost my temper and [C.G.] sustained some injuries." Mother then claimed she did not remember the child's injuries. Again, when pressed, she said, "I know that he had a broken nose, and that they alleged

10

that I had broken his arm. They also alleged that he had several bruises on him that—and markings."

Talking about her strengths, Mother testified that her home was in order, and she had completed anger management classes and could provide the certificate to St. Francis. She testified she went to therapy about every other week, as schedules allowed. Mother admitted she does not tell any of her current therapists the full extent of the circumstances about her aggravated battery conviction; she gives them a brief overview.

We note Mother testified that she started learning to control her anger in jail. She said she was struggling with controlling her anger when she cursed at the social worker who testified in court. She also testified that she was "rudely and strongly provoked" into her actions in May 2017 that led to her conviction for criminal threat. Mother testified that pleading no contest after the May arrest was taking responsibility for her actions because she could avoid prison, work on her children's cases, and it was what was best for her and her circumstances. She reiterated that she was provoked by the St. Francis worker. Anderson asked her, "But you don't believe you did anything wrong though, did you?" Mother replied, "That's—I mean, if I am wrong by cursing out the caseworker, absolutely, I'm wrong by cursing out the case worker."

When asked about her safety plan, she interrupted the attorney and answered, "My safety plan would be to not speak out of turn and to learn to hold my tongue in certain circumstances." When asked about a safety plan if her children upset her or were not listening, Mother did not convey she had such a plan. Instead, she claimed, "My children don't really have much trouble minding me. They're very good kids. I don't really have to get onto them for anything. They're very respectful. I'm very blessed with that."

The court found that Mother's continuing convictions for violent offenses while these cases were pending reflected that her circumstances were unlikely to change in the

future. The court observed that the children were doing well in placement and that it was in their best interests to terminate Mother's parental rights. The court adopted the closing arguments of the State and the two attorneys representing the children as findings of facts and conclusions of law. Ultimately, the court terminated Mother's parental rights to both children.

*How we will proceed.*

Mother challenges the sufficiency of the evidence to support the district court's determination that she is unfit under K.S.A. 2017 Supp. 38-2269, that the unfitness would remain unchanged in the foreseeable future, and that termination of her parental rights was in the best interests of the children. The State contends that there was clear and persuading evidence to support the district court's findings of fact and conclusions of law.

We review a district court's decision to terminate parental rights to determine if, after reviewing all the evidence in the light most favorable to the prevailing party, a rational fact-finder could have found it highly probable that the parent's rights should be terminated. *In re M.H.*, 50 Kan. App. 2d 1162, 1170, 337 P.3d 711 (2014). The evidence must be clear and convincing. K.S.A. 2017 Supp. 38-2269(a). When determining whether factual findings are supported by clear and convincing evidence, an appellate court does not weigh conflicting evidence, pass on the witnesses' credibility, or redetermine questions of fact. 50 Kan. App. 2d at 1170.

A district court must consider the applicability of nine nonexclusive factors when determining whether a parent is unfit. See K.S.A. 2017 Supp. 38-2269(b)(1-9). The existence of any one of these nine factors standing alone may establish grounds for termination of parental rights. K.S.A. 2017 Supp. 38-2269(f). If the district court finds a parent is unfit, then the court must consider whether termination of parental rights is in the best interests of the children. See K.S.A. 2017 Supp. 38-2269(g)(1).

12

The court here did not specify which subsection of the statute applied. Instead, for reasons that are unclear in the record, the judge merely adopted the suggested findings of fact and conclusions of law in the closing arguments offered by the State and the two attorneys appointed to represent the children. We do not recommend such a practice, especially when the attorneys' recommendations differ as they did here. We need the judge's reasoning on these statutory factors—not just the advocates' thoughts.

To us, Mother argues there was insufficient evidence to support termination under K.S.A. 2017 Supp. 38-2269(b)(1), (5), (6), (8), and (9). Mother concedes that (b)(2) could apply to terminate her parental rights because she admitted breaking C.G.'s nose. Also, Mother does not address nor contest the court's finding—by adoption of all the three lawyers' proposed findings—that factor (b)(4) applied to support termination of her parental rights.

An example in which the lawyers did not agree concerns factor (b)(8). Mother argues there was insufficient evidence to support termination under (b)(8), a lack of effort on her part to adjust her circumstances, conduct and conditions to meet the needs of K.H. and S.G. In her view, because the State and Bridgess argued for the application of this factor, but Anderson argued it did not apply, the district court—by adopting the parties' proposed factual findings and legal conclusions—made conflicting findings. Mother then argues that the district court's finding on housing—that her only real effort to adjust to the needs of the children was in finding appropriate housing—was unsupported by the record. Instead, she claims she always had housing.

We are unpersuaded. Mother's first argument about inconsistent findings conflates the court's adoption of the parties' factual findings on the history of the children's cases. The district court did not adopt the parties' arguments about those facts. Going on, Mother's second claim under (b)(8) about her efforts to find housing asks us to reweigh the evidence, which we cannot do. *In re M.H.*, 50 Kan. App. 2d at 1170.

13

Frankly, the record does not support Mother's contention that "she's always had housing." From the time Mother was released from jail in late August 2016 until the termination hearing in January 2018, Mother lived in several locations between two towns, and had even sometimes lived in a shelter. While the record reflects that Mother was never homeless and did make efforts to secure housing, her accommodations were not always appropriate to provide a stable and adequate home for the children.

Even so, Mother's efforts to secure and maintain appropriate housing for the children was just one consideration about her effort to adjust her circumstances, conduct and conditions to meet the needs of K.H. and S.G. The court also addressed Mother's criminal history throughout the case as a factor compelling termination.

Mother had significant criminal legal problems at least four times during these cases: October 2015; sometime before August 2016; May 2017; and one additional time before September 2017. The record reveals two separate felony convictions in August 2016 and May 2017. The second of these occurred while Mother was on probation for the first conviction. Mother also had a misdemeanor conviction while she was in jail pending the first felony conviction. All of these convictions were for violent or threatening crimes. although the record does not contain substantive details nor a disposition, Mother also had a pending probation violation as of her hearing in September 2017.

We find it significant that during Mother's family therapy sessions in the early part of 2017, she was unable to tell K.H. that she would try to make choices to keep herself out of jail. This record reveals a woman with a violent temper, unwilling to take steps to rein in her temper for the sake of her children. You cannot be a mother to two young children if you are sitting in jail because of your criminal behavior.

We cannot see that Mother made any significant progress in her individual therapy. Her attendance in therapy was inconsistent. She attended individual sessions

14

from early September 2016 to late February or early March 2017. At that time, her individual and family therapist referred Mother to another therapist for individual therapy because she was unwilling to work on her own issues and instead addressed issues from the family therapy sessions. Mother continued in family therapy through April 2017, but stopped after her arrest and conviction for criminal threat. Mother did not resume individual therapy until late June 2017, around the time the district court ordered her to attend individual therapy. She stopped attending therapy again in early August 2017, and did not resume until the time of the September 2017 hearing. Likewise, Mother attended an anger management program in late April 2017, but stopped when she was arrested and convicted in May, and resumed just before the September 2017 hearing. Mother was not following the recommendations of participating in special therapeutic programs.

Mother's own testimony at her termination hearing shows her unwillingness to acknowledge why the children were taken from her home in October 2015. She also showed a lack of candor on the nature of that arrest and the age of the victim. Mother was vague and evasive at the termination hearing about C.G.'s injuries and her role in causing them. And Mother acknowledged minimizing the circumstances of the October 2015 events, as well as lying about who the victim was, to some of her evaluators and treatment providers. Based on her testimony, these providers did not know that the victim was a three-year-old child.

There is clear and convincing evidence that K.S.A. 2017 Supp. 38-2269(b)(2), (b)(4), and (b)(8) apply and compel the termination of Mother's parental rights. The court did not abuse its discretion in finding that the termination was in the children's best interests. K.S.A. 2017 Supp. 38-2269(g).

Affirmed.