NOT DESIGNATED FOR PUBLICATION

No. 119,578

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Interest of J.F.,
A Minor Child.

MEMORANDUM OPINION

Appeal from Wyandotte District Court; DANIEL CAHILL, judge. Opinion filed March 1, 2019. Affirmed.

*Raymond E. Probst Jr.*, of The Probst Law Firm P.A., of Kansas City, for appellant.

*SueZanne M. Bishop*, assistant district attorney, and *Mark A. Dupree Sr.*, district attorney, for appellee.

Before GARDNER, P.J., ATCHESON and SCHROEDER, JJ.

PER CURIAM:  M.L.F. appeals the ruling of the Wyandotte County District Court terminating his right to parent J.F., his eight-year-old son. He contends that the evidence fails to support the finding of unfitness and that, in any event, he was given insufficient time to improve his circumstances to regain custody of J.F. The evidence established M.L.F. had continuing drug problems, did not obtain suitable housing or employment to support J.F., and displayed what appeared to be a deliberate indifference to the plan set up to permit him to reunite with J.F. We find no error in the district court's determination and affirm.

1

While J.F. was living with M.L.F. in California, state authorities there took custody of J.F. because he alleged M.L.F. had sexually abused him. S.M., J.F.'s mother, lived in Wyandotte County with his three half-siblings. In late November 2016, the Kansas Department for Children and Families began investigating S.M. as a potentially unfit parent. The district attorney filed a petition in January 2017 alleging J.F.'s half-siblings to be children in need of care. About that time, California transferred custody of J.F. to Kansas, where he remained a ward of the state. J.F. became the subject of this parallel child in need of care proceeding. For the most part, the proceedings for all four children were handled together in the district court.

The district court entered interim orders directing appropriate agencies to develop plans for reintegrating the family. Pertinent here, the agencies put together a reintegration plan for M.L.F. to regain custody of J.F. S.M.'s legal status with respect to J.F. and his half-siblings is not before us in this appeal.

The comprehensive plan for M.L.F. required that he obtain suitable housing and employment and that he participate in evaluations for various rehabilitative and educational programs, such as substance abuse counseling and parenting classes. The plan also called for M.L.F. to have regular visitation with J.F., ideally expanding from relatively short supervised visits at agency facilities set up for that purpose to longer unsupervised visits in the community. The district court monitored M.L.F.'s progress in the reintegration plan tailored for him.

On November 1, 2017, the State filed a motion to terminate the parental rights of M.L.F. and S.M. The district court held an evidentiary hearing on December 21, 2017, for M.L.F. The hearing for S.M. was postponed. The district court filed a journal entry on January 5, 2018, terminating M.L.F.'s parental rights to J.F. The district court found

M.L.F. to be unfit, the condition of unfitness would not change in the foreseeable future, and J.F.'s best interests would be furthered by the termination. M.L.F. has timely appealed the termination of his parental rights.

LEGAL ANALYSIS

We begin our review with an outline of legal principles governing termination actions and then apply those principles to the evidence. A parent has a constitutionally recognized right to a parental relationship with his or her child. See *Santosky v. Kramer*, 455 U.S. 745, 753, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982); *In re B.D.-Y.*, 286 Kan. 686, 697-98, 187 P.3d 594 (2008) (citing *Santosky*). Accordingly, the State may terminate parental rights with respect to a child only upon clear and convincing proof of parental unfitness. K.S.A. 2017 Supp. 38-2269(a); *Santosky*, 455 U.S. at 769-70; *In re R.S.*, 50 Kan. App. 2d 1105, Syl. ¶ 1, 336 P.3d 903 (2014).

After a child has been adjudicated a child in need of care, a district court may terminate parental rights "when the court finds by clear and convincing evidence that the parent is unfit by reason of conduct or condition which renders the parent unable to care properly for the child and the conduct or condition is unlikely to change in the foreseeable future." K.S.A. 2017 Supp. 38-2269(a). In considering a parent's unfitness, the district court may apply the factors outlined in K.S.A. 2017 Supp. 38-2269(b) but is not limited to them. Additional statutory factors apply when a child has been removed from the home. See K.S.A. 2017 Supp. 38-2269(c). A single factor may be sufficient to establish unfitness. See K.S.A. 2017 Supp. 38-2269(f).

In this case, the district court relied on five statutory factors in concluding that M.L.F. was unfit: (1) his long-term use of illegal drugs, K.S.A. 2017 Supp. 38-2269(b)(3); (2) his physical, mental, or emotional neglect of J.F., K.S.A. 2017 Supp. 38-2269(b)(4); (3) the inability of reasonable efforts by social service agencies to rehabilitate

3

the family, K.S.A. 2017 Supp. 38-2269(b)(7); (4) his lack of effort to adjust his circumstances, conduct, or conditions to meet the needs of J.F., K.S.A. 2017 Supp. 38-2269(b)(8); and (5) his failure to carry out a reasonable plan approved by the court directed toward reintegration of the family after J.F. had been removed from his custody, K.S.A. 2017 Supp. 38-2269(c)(3).

When the sufficiency of the evidence supporting a decision regarding the termination of parental rights is challenged, an appellate court will uphold the decision when, after reviewing the evidence in the record in a light most favorable to the prevailing party, the district court's findings are supported by clear and convincing evidence or, stated another way, the appellate court is persuaded that a rational fact-finder could have found it highly probable that the circumstances warrant the termination of parental rights. *In re B.D.-Y.*, 286 Kan. at 705. In evaluating the record, the appellate court does not weigh conflicting evidence, pass on the credibility of witnesses, or determine factual questions. *In re Adoption of B.B.M.*, 290 Kan. 236, 244, 224 P.3d 1168 (2010); *In re M.H.*, 50 Kan. App. 2d 1162, 1170, 337 P.3d 711 (2014).

The specific circumstances prompting California to remove J.F. from M.L.F.'s custody are not clear from the record. The district court declined to rely on the proceedings in California in considering termination and based its ruling on what happened after J.F. was transferred to Kansas in January 2017.

The evidence at the termination hearing showed that M.L.F. did virtually nothing significant to achieve the objectives set out in the reintegration plan the district court approved in February 2017. He failed to maintain monthly contact with Charissa Boldridge, his case manager, contacting her only three times. Although M.L.F. contacted Paula Blevins, his case worker, on a monthly basis, he consistently refused to schedule in-person meetings with her notwithstanding her requests. He told her he needed to work.

4

M.L.F. did sign releases for information as requested by the social service agencies. But he put off a psychosocial evaluation for four months. At the termination hearing, M.L.F. attributed the delay to lack of communication from his case worker. The case worker disputed his contention. The evidence also showed M.L.F. did nothing to follow up with the recommendations made as a result of the evaluation.

One of the recommendations involved parenting classes. M.L.F. never attended parenting classes, even though he was offered options for free classes. According to Blevins and Boldridge, M.L.F.'s parenting skills were markedly inadequate. During the supervised visits, which M.L.F. did regularly attend, he discussed his case with the case worker, talked about the sexual abuse allegations with J.F., spoke negatively about J.F.'s half-sisters, and told J.F. that he was living in his car or in unsanitary living conditions instead of focusing his attention on J.F. Out of 23 visits with J.F., M.L.F. exhibited appropriate parenting without redirection from the case worker only once. He frequently arrived late to the visits and often completed phone calls before turning his attention to J.F. On several occasions during the hour-long visits, M.L.F. would lay his head back in a chair and fall asleep. Based on M.L.F.'s behavior, Blevins suspected that he sometimes came to visitation under the influence of methamphetamine. During the visits, M.L.F. routinely resisted engaging in activities J.F. wanted him to do, instead complaining that J.F. always got to choose the activity. According to the case workers, M.L.F. also became frustrated when he could not understand J.F. and occasionally yelled at him for age-appropriate behavior. Almost needless to say, M.L.F. was not authorized to have unsupervised community visits with J.F.

Throughout the case, M.L.F. never had stable housing. For months, he ignored offers from the social service agencies to help him find suitable housing. He instead chose to live in an extended-stay hotel or in his car. Though he claimed to be a self-employed construction subcontractor, M.L.F. never provided requested documentation to his supervising social workers confirming any gainful employment. M.L.F. didn't obtain

5

a mental health assessment, even though Blevins had referred him to a clinic. He never set up individual or family therapy sessions.

The hearing evidence showed M.L.F. had continuing substance abuse issues. He refused to submit to random UAs that Boldridge and Blevins requested. When first requested to take a UA, he provided what appeared to be an adulterated sample and refused to provide a fresh sample. The sample he provided tested positive for amphetamines. Thereafter, M.L.F. refused every request for a UA. He admitted at trial that he refused because of "serious stubbornness." As a result of the initial positive test, M.L.F. was directed to obtain a drug and alcohol evaluation. He never did. When Blevins suspected M.L.F. of being under the influence of drugs at a visit with J.F., she requested a UA. M.L.F. reacted hostilely and refused to comply.

At the termination hearing, M.L.F. acknowledged he had been arrested in August for possession of methamphetamine and later had pleaded guilty. He testified at the hearing that he anticipated receiving probation at this sentencing. The evidence at the hearing indicated M.L.F. had been unable to comply with pretrial bond conditions in the criminal case. As a result of the criminal charges, M.L.F. had been in jail for several weeks.

According to his case workers, M.L.F. consistently laid blame for his failure to meet the objectives in the reintegration plan on the purported missteps of others—consistent with what they observed to be his general attitude in blaming his misfortunes on people and circumstances beyond his control. During the hearing, M.L.F. told the district court that he could have completed the reintegration tasks if people had helped him instead of working against him. He admitted that he regularly questioned the authority of the case workers and did not comprehend the importance of complying with their requests.

6

On appeal, M.L.F. does not really press an argument that he had complied with the reintegration tasks at the time of the termination hearing. Rather, he contends he was permitted only about 10 months to meet those requirements and should have been given longer. The argument effectively focuses on the component of termination rooted in the unlikelihood of change in the foreseeable future.

The evidence supports the district court's determination of unfitness under the enhanced appellate standard in termination cases. M.L.F.'s continuing and unresolved drug issues manifested by his positive drug test, his repeated avoidance of later drug tests, his refusal to obtain counseling, and his arrest and conviction for possession of methamphetamine satisfy the statutory basis of unfitness for drug use rendering a parent unable to physically or emotionally care for a child. The statutory grounds are, of course, interconnected. M.L.F. had also neglected J.F. M.L.F. had no steady employment and no place to live himself, let alone a home suitable for raising a child. During the scheduled visits with J.F., M.L.F. was distant—sometimes even in a stupor—and more than occasionally verbally abusive of J.F. or his half-siblings. All of that was highly inappropriate. We may infer that M.L.F.'s drug problems contributed to his neglectful behavior—another statutory ground of unfitness.

There is ample evidence the case workers crafted a reasonable reintegration plan for M.L.F. And he simply ignored the vast majority of what would have been required to regain custody of J.F. Not to put too fine a point on it, M.L.F. exerted little or no effort to work on the tasks or to otherwise improve his circumstances so he could parent J.F. This is not a case in which a parent dutifully tries to reintegrate and simply lacks the capacity to do so. The evidence, therefore, supports the finding of unfitness because reasonable efforts of appropriate social service agencies have not effected reintegration of the family. And the same evidence supports the complementary ground that M.L.F. has failed to carry out a reasonable reintegration plan. Finally, M.L.F.'s conduct displayed a striking lack of effort on his part to change his circumstances to accommodate J.F.'s needs.

7

Without rehashing the evidence, M.L.F.'s lack of effort to address his drug problem, establish gainful employment, and to find suitable housing strikingly undercut any possibility of his reuniting with J.F.

At the hearing, M.L.F. acknowledged he was not then prepared to parent J.F. and would need three to six months to be in a position to do so. He offered no details as to how he would accomplish his stated goal. But the record contains significant evidence conflicting with that ambitious (and self-serving) prediction of success. M.L.F.'s own conduct during the case to that point strongly indicated a disquieting lack of both an appreciation of what actually needed to be done and a modicum of initiative to get it done.

Other evidence undercut M.L.F.'s timetable for success. Rachel Stompoly, J.F.'s permanency case manager, testified M.L.F. would likely need a year from the resolution of his criminal case, assuming he were placed on probation, to find suitable housing, demonstrate a stable income, and resolve the issues that led to J.F. being removed from the home. She explained that J.F. is engaged in intensive psychotherapy for possible ADHD and autism—conditions that call for highly competent, dedicated parenting. Stompoly testified that M.L.F. should participate in both individual therapy to work through his long absences from J.F. and family therapy with J.F. Strompoly and Blevins told the district court M.L.F. needed to improve his parenting skills to reintegrate with J.F. Blevins suggested developing those skills, given J.F.'s needs, could take months.

In gauging the foreseeable future under K.S.A. 2017 Supp. 38-2269, the courts should use "child time" as the measure. As the Revised Kansas Code for Care of Children, K.S.A. 2017 Supp. 38-2201 et seq., recognizes, children experience the passage of time in a way that makes a month or a year seem considerably longer than it would for an adult, and that different perception typically points toward a prompt, permanent disposition. K.S.A. 2017 Supp. 38-2201(b)(4); *In re M.B.*, 39 Kan. App. 2d 31, 45, 176

8

P.3d 977 (2008); *In re G.A.Y.*, No. 109,605, 2013 WL 5507639, at *1 (Kan. App. 2013) (unpublished opinion) ("'child time'" differs from "'adult time'" in care proceedings "in the sense that a year . . . reflects a much longer portion of a minor's life than an adult's"). Here, that factor takes on particular significance, given J.F.'s comparatively young age and the distinctly fractured parental relationship between him and M.L.F.

Based on the evidence presented during the hearing, the district court had sufficient evidence to conclude that M.L.F.'s unfitness was unlikely to change in the foreseeable future. As we have already pointed out, M.L.F.'s dismal track record weighs against any substantial likelihood of the sweeping changes necessary for successful reintegration.

J.F. had been in state custody for about one year at the time of the termination hearing. Reintegration would take months and more realistically another year, possibly longer. Even then, the prospects for success were, at the very best, guarded. Especially given child time, the district court correctly concluded M.L.F. was likely to continue to be unfit for the foreseeable future. In making that determination, the district court necessarily concluded M.L.F. had been given sufficient time—10 months—to make real, substantial progress toward reintegration and had done virtually nothing useful with that time. We find no fault with the district court's conclusion that the statutory grounds of unfitness and unlikelihood of change had been met.

Having found unfitness, the district court then had to decide whether termination of parental rights was "in the best interests" of J.F. K.S.A. 2017 Supp. 38-2269(g)(1). As directed by K.S.A. 2017 Supp. 38-2269(g)(1), the district court should give "primary consideration to the physical, mental[,] and emotional health of the child." A district court makes the best interests determination based on a preponderance of the evidence. See *In re R.S.*, 50 Kan. App. 2d at 1116. The determination essentially rests in the district court's sound judicial discretion. 50 Kan. App. 2d at 1115-16. An appellate court reviews

9

those sorts of decisions for abuse of discretion. A district court exceeds that broad latitude if it rules in a way no reasonable judicial officer would under the circumstances, if it ignores controlling facts or relies on unproven factual representations, or if it acts outside the legal framework appropriate to the issue. See *Northern Natural Gas Co. v. ONEOK Field Services Co.*, 296 Kan. 906, 935, 296 P.3d 1106 (2013); *State v. Ward*, 292 Kan. 541, Syl. ¶ 3, 256 P.3d 801 (2011).

On appeal, M.L.F. has not disputed the district court's finding on best interests. Given the testimony about J.F.'s need for exceptional parenting and the evidence demonstrating M.L.F.'s lack of even rudimentary parenting skills, the district court acted well within its discretion in finding J.F.'s best interests were served by termination. The district court's conclusion was bolstered by the other evidence highlighting M.L.F.'s largely indifferent attitude toward J.F. during their visits and his overall lack of desire to take the steps necessary to regain custody of J.F., including his ongoing use of illegal drugs and the cascading negative impact that had on other aspects of his life.

Affirmed.